# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HEIDELBERG USA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 07-601-GMS |
| | ) | |
| SCREENTONE SYSTEMS CORPORATION, ACACIA PATENT ACQUISITION CORPORATION, ACACIA RESEARCH CORPORATION, and PAUL S. SNYPP, | ) | |
| Defendants. | ) | |
| KONICA MINOLTA BUSINESS SOLUTIONS U.S.A., INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 07-602-GMS |
| | ) | |
| SCREENTONE SYSTEMS CORPORATION, ACACIA PATENT ACQUISITION CORPORATION, ACACIA RESEARCH CORPORATION, and PAUL S. SNYPP, | ) | |
| Defendants. | ) | |

## DEFENDANTS' REPLY BRIEF IN SUPPORT
## OF THEIR MOTION TO STAY OR TRANSFER PENDING RESOLUTION OF ISSUES
## BY THE EASTERN DISTRICT OF TEXAS, THE FIRST-FILED COURT,
## OR, IN THE ALTERNATIVE, MOTION TO DISMISS

Karen V. Sullivan (No. 3872)
OBERLY, JENNINGS & RHODUNDA, P.A.
1220 Market Street, Suite 710
P.O. Box 2054
Wilmington, DE  19899
(302) 576-2000 – Telephone
(302) 576-2004 – Facsimile
ksullivan@ojlaw.com

Edward R. Nelson III
Texas State Bar No. 00797142
David Skeels
Texas State Bar No. 24041925
FRIEDMAN, SUDER & COOKE
604 East 4th Street, Suite 200
Fort Worth, TX 76102
(817) 334-0400
(817) 334-0401 fax

Attorneys for Defendants Screentone Systems
Corporation, Acacia Patent Acquisition
Corporation, Acacia Research Corporation and
Paul S. Snypp

Dated:  December 20, 2007

## <u>TABLE OF CONTENTS</u>

Table of Contents ...................................................................................................iii

Table of Citations....................................................................................................iv

Introduction............................................................................................................1

Argument ...............................................................................................................2

I.      Screentone had standing to file the Texas Action.............................................2

       A.    The 2003 Repossession and Disposition Agreement transferred the '809 patent from SeeColor to Snypp ...............................................................3

            1.    The assignment language must be read in context .......................................4

            2.    The Recital Section established the parties' intent .....................................5

            3.    Section 2 must be interpreted in light of, and harmonized with, other Agreement provisions .................................................................7

            4.    Use of the Washington strict foreclosure statute demonstrates the parties did not contemplate any further action ......................................9

       B.    Snypp's assignment to APAC (who later assigned to Screentone) was fully effective to vest APAC with legal title ................................................10

II.     Konica Minolta distorts the law of misnomer through its overly restrictive analysis ......11

III.    Transfer to the Texas Court is justified by the first-to-file rule *and* under the § 1404(a) convenience factors...........................................................................13

       A.    Transfer to Texas is proper under the first-to-file rule, as applied by this Court ..13

       B.    The Section 1404(a) convenience factors favor transfer to Texas........................16

IV.    Conclusion ........................................................................................17

## <u>TABLE OF CITATIONS</u>

<u>Cases</u>

*Bank of Am., N.A. v. Every Penny Counts, Inc.*,
    No. 07-159-GMS, 2007 U.S. Dist. LEXIS 67107 (D. Del. Sept. 11, 2007) ............... 13-16

*Dippold-Harmon Enters., Inc. v Lowe's Companies, Inc.*,
    No. 01-532-GMS, 2001 U.S. Dist. LEXIS 18547 (D. Del. Nov. 13, 2001) ..................... 13

*Electronics for Imaging, Inc. v. Coyle*,
    394 F.3d 1341 (Fed. Cir. 2005) ................................................................................ 15

*Findley v. City of Baton Rouge*,
    570 So. 2d 1168 (La. 1990) ...................................................................................... 13

*Grant County Constructors v. E.V. Lane Corp.*,
    459 P.2d 947 (Wash. 1969) ....................................................................................... 5

*Infotronics Corp. v. Varian Assoc. Corp.*,
    45 F.R.D. 91 (S.D. Tex. 1968) ............................................................................ 11-12

*IpVenture, Inc. v. Prostar Computer, Inc.*,
    No. 2006-1012, 2007 U.S. App. LEXIS 22893 (Fed. Cir. Sept. 28, 2007) ..................... 4

*Jumara v. State Farm Ins. Co.*,
    55 F.3d 873 (3d Cir. 1995) ...................................................................................... 14

*Network-1 Sec. Solutions, Inc. v. D-Link Corp.*,
    433 F. Supp. 2d 795 (E.D. Tex. 2006) ..................................................................... 16

*Young v. Armstrong World Indus., Inc.*,
    601 F. Supp. 399 (N.D. Tex. 1984) ......................................................................... 16

## <u>Statutes</u>

28 U.S.C. § 1404(a) ..................................................................................... 2, 13, 16-17

WASH. REV. CODE § 62A.9A-619 (2002) ................................................................. 8

WASH. REV. CODE § 62A.9A-620 (2007) ................................................................. 9

## <u>Rule</u>

Fed. R. Civ. P. 15 ................................................................................................ 11-13

## <u>Other</u>

The American Heritage Dictionary (2d ed. 1985) ...........................................................................5

Webster's Revised Unabridged Dictionary (1913) .........................................................................5

# INTRODUCTION

On the basis of the first-to-file rule, Defendants Screentone Systems Corporation ("Screentone"), Acacia Patent Acquisition Corporation ("APAC"), Acacia Research Corporation and Paul Snypp ("Snypp") (collectively, "Screentone") moved to stay the instant proceedings (the "Delaware Action") until the identical issues are resolved by the Eastern District of Texas (the "Texas Court").  Alternatively, Screentone moved this Court to transfer this action to the Texas Court, or to dismiss it entirely.  Heidelberg USA, Inc. ("Heidelberg") and Konica Minolta Business Solutions U.S.A., Inc. ("KM Business") responded by regurgitating arguments made previously in their respective motions to dismiss the first-filed Texas Action.

Heidelberg and KM Business (sometimes referred to herein as the "Delaware Plaintiffs" or the "Texas Defendants")[1] have failed to demonstrate how judicial economy would be served by proceeding with parallel litigation in three different courts.[2]  In fact, parties on both sides of the docket agree that this Court should "stay . . . the present Delaware Action until the Texas Court resolves the standing issue."[3]

Despite this concession, Heidelberg proceeds to spend almost the entirety of its Response arguing that Screentone lacked standing to file its Texas Action.[4]  Heidelberg also argues that it would be more convenient (at least for Heidelberg) to litigate these matters in Delaware.  KM Business makes the same arguments.  KM Business also argues that a curable misnomer —

---

[1] The Delaware lawsuit filed by Heidelberg is docketed as Case 1:07-cv-00601-GMS-LPS, and the Delaware lawsuit filed by KM Business is docketed as Case 1:07-cv-00602-GMS-LPS.  Screentone will refer to "Case 601" and "Case 602," as appropriate, when referring to certain exhibits on file with the Court.

[2] Screentone is fighting an identical battle on a third front ?  in the Western District of Washington ?  where the remainder of the Texas defendants filed a declaratory judgment action based on the same arguments raised here.

[3] *See, e.g.,* Plaintiff Heidelberg's Response to Defendant's Motion to Stay or Transfer Pending Resolution of Issues by the Eastern District of Texas, or, in the Alternative, Motion to Dismiss (Case 601, D.I. 19) (hereinafter "Heidelberg's Response") at 2.

[4] *See* Heidelberg's Response (Case 601, D.I. 19) at 1-10.

whereby Screentone named KM Printing in the Texas Action instead of its successor, KM

Business — tilts the first-to-file analysis in its favor.  Screentone now files this Reply.[5]

## ARGUMENT

Despite their coordinated efforts to escape the first-filed Texas Action, the Delaware

Plaintiffs cannot persuasively explain why this Court should disregard the well-settled first-to-

file rule, which favors Screentone's choice of the Texas forum and counsels against the second-

filed Court ruling on issues that are already pending in the first-filed court.  Plaintiffs' arguments

will be addressed in turn.  First, Screentone had standing to file the Texas Action.  Second,

Screentone's first-filed status is not altered by a curable misnomer.  Third, to the extent this

Court determines that a stay is inappropriate, transfer of this action to the Texas Court is justified

by the first-to-file rule *and*, similarly, under the Section 1404(a) convenience factors.

## I.     Screentone had standing to file the Texas Action.

If this Court declines Screentone's and Heidelberg's requests for an immediate stay and,

instead, chooses to evaluate and rule on the standing issue, it will see that Screentone had

standing to bring the Texas Action.  The Delaware Plaintiffs argue that "if [Screentone] lacked

initial standing, the [Texas] suit must be dismissed."[6]  Conversely, if Screentone properly

---

[5] KM Business has now revealed that its declaratory judgment action in Delaware was a ruse designed to manufacture the appearance of "multi-district litigation."  Shortly before this Reply Brief was to be filed, Screentone's counsel received word that six of the Texas Defendants, including KM Business, have filed a Motion to Transfer with the Judicial Panel on Multidistrict Litigation, pursuant to 28 U.S.C. § 1407, in an action styled *In re '809 Patent Litigation*.  The motion seeks transfer of this case, as well as transfer of the Texas Action and transfer of yet another declaratory judgment action now pending against Screentone in the Central District of California, to the Western District of Washington or, alternatively, to the Central District of California.  This is remarkable in light of Konica Minolta's representations to this Court that "the convenience of the parties and the interests of justice clearly favor the instant action proceeding in Delaware."  Plaintiff's Brief in Opposition to Defendants' Motion to Stay or Transfer Pending Resolution of Issues by the Eastern District of Texas, or, in the Alternative, Motion to Dismiss (Case 602, D.I. 18) at 18 (hereinafter "KM Business Response").  Such gamesmanship, whereby KM Business *creates* multi-district litigation and then complains about the inefficiencies of multi-district litigation, must be rejected.

[6] *See, e.g.*, Heidelberg's Response (Case 601, D.I. 19) at 1, 2.

2

acquired title to the '809 patent, then it had standing to file the Texas Action, and Plaintiffs' arguments fail.

Title to the '809 patent passed from its original assignee, SeeColor Corp., to its current owner, Screentone, as shown below:

SeeColor Corp. → Snypp → APAC → Screentone

Heidelberg and KM Business attempt to poke holes in the chain of title, specifically attacking the links from SeeColor to Snypp, and from Snypp to APAC. But the record shows: (1) that a 2003 Repossession and Disposition Agreement effectuated an immediate transfer of the '809 patent from SeeColor to Snypp; and (2) Snypp made a valid assignment of the patent to APAC.[7]

### A. The 2003 Repossession and Disposition Agreement transferred the '809 patent from SeeColor to Snypp.

Plaintiffs' flawed standing analysis is rooted in its failure to properly consider non-public documents that affect the chain of title. Instead, Plaintiffs point repeatedly to the public record:

- "Public records show a broken or incomplete chain of title from the inventor of the '809 patent to Screentone."[8]

- "The U.S.P.T.O.'s assignment records have no record of any assignment of the '809 patent from the original assignee of record, SeeColor, to Mr. Snypp, APAC, or Screentone."[9]

- "Based on the public record, Mr. Snypp was without right, authorization, title, license or permission from SeeColor to assign the '809 patent to APAC in August 2005."[10]

But the chain of title includes a key document that was not part of the public record prior to these proceedings ? the Repossession and Disposition Agreement (the "Repossession Agreement")

---

[7] Plaintiffs do not challenge the assignment from APAC to Screentone.

[8] Heidelberg's Response (Case 601, D.I. 19) at 2;

[9] Heidelberg's Response (Case 601, D.I. 19) at 4.

[10] Heidelberg's Response (Case 601, D.I. 19) at 5.

3

executed in 2003 between SeeColor Corp. and Snypp.  The simple, three-page Repossession Agreement transferred to Snypp all of SeeColor's assets, including the '809 patent and other intellectual property, in satisfaction of a debt owed Snypp (and for which Snypp maintained a perfected security interest).[11]  The Repossession Agreement has not been filed of record with the USPTO, nor is it required to be.  The impact and legal effect of the Agreement is described more fully below.

### 1.    The assignment language must be read in context.

Plaintiffs argue that the Repossession Agreement did not transfer ownership of the '809 patent because, when executed, it merely obligated SeeColor to execute additional papers to effect the transfer.  To support this position, Plaintiffs improperly isolate a single provision, to wit:

> All transfers/assignments shall be endorsed by Debtor upon execution of this agreement.[12]

Plaintiffs then cite *IpVenture, Inc. v. Prostar Computer, Inc.* for the proposition that "an agreement to assign does not convey an interest in the patent; transfer of the interest must be implemented by written assignment."  No. 2006-1012, 2007 U.S. App. LEXIS 22893 (Fed. Cir. Sept. 28, 2007).  *IpVenture* is inapposite because it involved an employment contract which required the employee to assign <u>future</u> inventions to his employer.  *Id.* at *4-5.  Hence, at the time the employee executed the contract, there was no invention to convey.  This stands in stark contrast to the circumstances here, where the Repossession Agreement conveyed existing inventions and patent rights.

---

[11] *See generally* Repossession Agreement, attached as Exh. 7 to the Declaration of Steven F. Meyer in Support of Plaintiff Heidelberg's Response to Defendants' Motion to Stay (Case 601, D.I. 20-2) (hereinafter "Repossession Agreement").

[12] Repossession Agreement (Case 601, D.I. 20-2, Exh. 7) at 1, Recital No. 6.

Moreover, Plaintiffs' construction of the aforementioned provision is but one plausible reading. A better interpretation of the phrase "All transfers/assignments shall be *endorsed* by Debtor *upon* execution of this agreement" is that the various "transfers/assignments" of the secured collateral were consummated and acknowledged by SeeColor's signature to the contract.[13] In other words, the act of SeeColor's signature implemented the transfers/assignments it was obligated to make. This meaning of the Repossession Agreement is supported by considering other operative provisions in the document.

Under Washington law:[14]

> [C]ourts are in nearly universal agreement in construing written contracts that the primary purpose of a judicial interpretation is to ascertain the parties' intentions, give effect to them and make the parties' intentions controlling. The intentions of the parties should be ascertained from the entire writings, and, if at all possible, **all parts of the writings shall be construed so as to harmonize with one another**.

*Grant County Constructors v. E.V. Lane Corp.*, 459 P.2d 947, 953 (Wash. 1969) (internal citations omitted). To harmonize all relevant parts of the Repossession Agreement is to find that Snypp owned the '809 patent from the moment SeeColor signed the contract.

## 2.     The recital section established the parties' intent.

The Recitals section of the Repossession Agreement uses unequivocal, present tense language to make clear that its purpose was to fully and forever discharge the SeeColor

---

[13] In this context, "endorsed" is best interpreted as "acknowledged." *See, e.g.*, The American Heritage Dictionary 452-53 (2d ed. 1985) (defining "endorse" as "to acknowledge (receipt of payment) by signing a bill, draft, or other instrument…to give approval or support to; sanction"). Here, the payment or consideration contemplated by the Repossession Agreement included the patent assignment. The phrase, "*upon* execution of this agreement" is best interpreted as "*by means of* execution of this agreement." *See, e.g.*, Webster's Revised Unabridged Dictionary (1913), available online at www.machaut.uchicago.edu (showing, in usage note, that "upon" is used to mean "in consequence of" or "by means of").

[14] Washington substantive law governs construction of the Repossession Agreement.

indebtedness to Snypp by consenting to Snypp's foreclosure on SeeColor assets pursuant to his

perfected security interest:

> Creditor has proposed to Debtor that Creditor retain the Collateral
> in satisfaction of the debt owing to Creditor.  Debtor desires to
> consent to such retention of Collateral. . . .  [I]t is the **intention** of
> **Debtor and Creditor that the acceptance of the secured**
> **collateral fully satisfies any debts and obligations otherwise**
> **owing to Creditor**.  Creditor accepts the secured collateral . . .[15]

The Agreement explains further that the SeeColor Board of Directors had previously

"determined that *it was in the best interest of the Seecolor Corporation to surrender the assets to*

*Creditor . . . .*"[16]  The referenced "Collateral" and "assets" included "equipment, supplies,

tangible and intangible products,...chattels, **patents**, trade secrets and accounts."[17]

    Plaintiffs argue, without support, that the Repossession Agreement is fatally flawed

because it does not specifically identify the '809 patent.  But it lists specific types of assets,

including patents, and SeeColor disposed of *all* assets as a consequence of the repossession.  In

any event, the record makes it clear that SeeColor owned the patent.[18]  And, as Plaintiffs have

detailed, there is no evidence (public record or otherwise) that SeeColor transferred the '809

patent to anyone other than Snypp.

    The parties' intent being to liquidate immediately an entire debt, execution of the

Repossession Agreement can only be deemed to have made an immediate and present transfer of

---

[15] Repossession Agreement (Case 601, D.I. 20-2, Exh. 7) at 1, Recital No. 6 (emphasis added).

[16] Repossession Agreement (Case 601, D.I. 20-2, Exh. 7) at 1, Recital No. 5 (emphasis added).  Note that the Agreement uses the past tense to indicate that it "*was*" in the Corporation's best interest to surrender the assets, suggesting that the assets had already been surrendered and that this Agreement was simply a memorialization or implementation of that transfer.

[17] Repossession Agreement (Case 601, D.I. 20-2, Exh. 7) at 1, Recital No. 2.

[18] *See* Patent Assignment Abstract of Title, attached as Exh. 1 to Declaration of Steven F. Meyer in Support of Plaintiff Heidelberg's Response to Defendants' Motion to Stay (Case 601, D.I. 20-2).

the collateral given. Holding otherwise would abrogate the parties' intent and be inconsistent

with the parties' post-agreement conduct, whereby no one but Snypp sought to exercise rights as

the '809 patent owner.[19]

### 3.    Section 2 must be interpreted in light of, and harmonized with, other agreement provisions.

Plaintiffs cherry picked one section of the Repossession Agreement to sustain an

argument that Snypp never took ownership of the '809 patent. The reason for this is evident:

When the language upon which Plaintiffs rely is considered in proper context, a different result

obtains. For instance, Section 4 of the Repossession Agreement states:

> Creditor **accepts** the Collateral in full satisfaction of Debtor's debt, pursuant to RCW 63A.9A.620 [Washington's strict foreclosure statute]…
>
> a. [and Debtor] **Transfers** to Creditor **all of the Debtor's right** in and to the Collateral.[20]

This provision demonstrates a present and effective transfer of the Collateral, including the '809

patent. Plaintiffs fail to address Section 4 in their briefs, focusing instead on Section 7 which,

like Section 4, contains present transfer language such as: (i) "Debtor hereby transfers legal title

to Creditor…"; and (ii) "Creditor has acquired the rights of the Debtors in the collateral."[21]

Indeed, the Agreement specifically "acknowledge[s]" the "receipt and sufficiency" of "the

---

[19] *See* Declaration of Paul Snypp (attached hereto as Exhibit A), which was previously filed by Screentone in the Texas Action under the title "Declaration of Paul Snuypp in Support of Plaintiff's Sur Reply in Opposition to Defendants' Motions to Dismiss or Transfer" (hereinafter "Snypp Decl.") at ¶ 6 and Exh. 3 thereto (maintenance fees documentation).

[20] Repossession Agreement (Case 601, D.I. 20-2, Exh. 7) at 2 (emphasis added).

[21] Repossession Agreement (Case 601, D.I. 20-2, Exh. 7) at 3.

mutual benefits and forbearances" contemplated by the Repossession Agreement, including the transfer of all patent rights.[22]

Plaintiffs argue that the Repossession Agreement, including the assignment language of paragraph 2, need not be read in context or as a whole, because "paragraph 2 . . . provides no indication this paragraph must be considered in conjunction with any other sections of the agreement . . . ."[23]  This argument suggests that every paragraph of every contract must include a disclaimer that reads: "This paragraph must be read in context."  Neither Washington law nor the law of any other jurisdiction will countenance such an absurd proposition.

Plaintiffs make a strained argument regarding Section 7 in an effort to persuade the Court to disregard its present transfer language.  They say Section 7 "provides a mechanism to assist the transferee in obtaining amendment of official records regarding title to collateral."  While true that the Section 7 "transfer statement" assists a transferee in having <u>recorded</u> title to collateral changed,[24] nothing limits the effect of the language.  In fact, it follows that an actual change in ownership precedes any recorded change.

Lastly, the final section (Section 8), entitled "Possession", provides that the "Creditor is entitled to **<u>immediate possession</u>** of the Collateral."[25]  This language is also consistent with a present transfer in ownership of the collateral without resort to further action (other than the execution of the Repossession Agreement itself).

---

[22] Repossession Agreement (Case 601, D.I. 20-2, Exh. 7) at 1.

[23] *See, e.g.*, Heidelberg's Response (Case 601, D.I. 19) at 8.

[24] *See* Exh. B, Declaration of Edward R. Nelson, III, previously filed by Screentone in the Texas Action under the title "Declaration of Edward R. Nelson, III in Support of Plaintiff's Sur Reply in Opposition to Defendants' Motions to Dismiss or Transfer" (hereinafter Nelson Decl.) at Exh. 1 (WASH. REV. CODE § 62A.9A-619 (2002)).

[25] Repossession Agreement (Case 601, D.I. 20-2, Exh. 7) at 3 (emphasis added).

4.    **Use of the Washington strict foreclosure statute demonstrates the parties did not contemplate any further action.**

The Repossession Agreement specifically provides that Snypp took the SeeColor collateral pursuant to the Washington strict foreclosure statute.[26]  Official Comment 2 to this statute states:

> This section and the two sections following deal with strict foreclosure, a procedure by which the secured party acquires the debtor's interest in the collateral **without the need for a sale or other disposition** ….

WASH. REV. CODE § 62A.9A-620, cmt. 2 (emphasis added).[27]  Further, Official Comment 3 explains that, under the strict foreclosure statute, "an acceptance of collateral" by the creditor occurs when the debtor consents "by agreeing to the acceptance in writing after default."  And Official Comment 7 provides that intangible property, such as patents, is properly the subject of strict foreclosure:

> This section eliminates the requirement in former section 9-505 that the secured party be "in possession" of collateral. It clarifies that intangible collateral, which cannot be possessed, may be subject to a strict foreclosure under this section.

By invoking the Washington strict foreclosure statute, it is apparent that SeeColor conveyed all rights in the Collateral, including the '809 patent, to Snypp without taking any further action, such as executing a pro forma assignment document.  The Repossession Agreement is the assignment mechanism, transferring ownership when signed.

---

[26] Repossession Agreement (Case 601, D.I. 20-2, Exh. 7) at 1; *see also* Exh. B, Nelson Decl. at Exh. 1 (WASH. REV. CODE § 62A.9A-620 (2002)).

[27] See Exh. B, Nelson Decl. at Exh. 1 (official comments to WASH. REV. CODE § 62A.9A-620 (2007)).  Note that the 2002 version of this statute in effect at the time of the execution of the Repossession Agreement is identical to the current version to which the official comments are attached.

**B. Snypp's Asignment to APAC (who later assigned to Screentone) was fully effective to vest APAC with legal title.**

Snypp sold, assigned, and transferred his complete ownership in the '809 patent to APAC by Agreement effective August 25, 2005 (the "Snypp/APAC Agreement").[28]  Specifically, Section 1 of the Agreement — entitled, ASSIGNMENT — achieves the complete transfer of '809 patent to APAC "[e]ffective upon the date hereof," including "the right to sue for past, present and future infringement" and "to collect and receive any damages, royalties, or settlements . . . ."[29]

Section 1 of the Snypp/APAC Agreement contemplates the execution of a pro forma assignment document (for attachment to the Agreement as Exhibit B).[30]  Such an assignment document typically serves the purpose of record notice, or prima facie evidence, of the ownership change when filed with the USPTO.  In this instance, the assignment document omits language concerning the right to seek past damages.  But the principal Agreement contains the requisite stipulation.  Even if the assignment was deficient with respect to past damages, the assignment was effective to transfer, at a minimum, any and all other rights associated with the patent, including the right to sue for infringement damages from the date of the assignment forward.   Accordingly, APAC had every right to transfer the patent to Screentone, as it subsequently did.

The Defendants make an issue of the fact that Snypp signed the Snypp/APAC Agreement on August 2, 2005, signed the pro forma assignment document on August 3, 2005, then granted a

---

[28] Snypp/APAC Agreement, attached as Exh. 8 to the Declaration of Steven F. Meyer in Support of Plaintiff Heidelberg's Response to Defendants' Motion to Stay (Case 601, D.I. 20-2, Exh. 8) (hereinafter "Snypp/APAC Agreement") at 1.

[29] Snypp/APAC Agreement (Case 601, D.I. 20-2, Exh. 8) at 1.

[30] Snypp/APAC Agreement (Case 601, D.I. 20-2, Exh. 8) at 1, and Exh. B thereto.

non-exclusive license to Newscolor, LLC (a company that he co-owns) on August 22, 2005. But the Snypp/APAC Agreement was not formally consummated until August 25, 2005.[31]

In sum, the assignment from SeeColor to Snypp was proper and effective. The assignment from Snypp to APAC (who later assigned its rights to Screentone) was likewise proper and effective. At a minimum, the Snypp/APAC Agreement was sufficient to transfer ownership of the '809 patent to APAC, including the right to seek present and future damages. Nevertheless, in an effort to maximize recoverable damages (and out of an abundance of caution), Screentone sought leave in the Texas Court to add Snypp and APAC as plaintiffs and expects that leave will be granted.

## II.     Konica Minolta distorts the law of misnomer through its overly restrictive analysis.

In the Texas Action, Screentone has sought to cure its misnomer by amending the Complaint to name KM Business instead of KM Printing. KM Business argues in its Response that the amendment should not be allowed to relate back to the original filing under the auspices of Rule 15 because Screentone "deliberately and purposefully identified and sued KM Printing [in the Texas Action]." Screentone did not "intend" to sue KM Printing, per se. Rather, it intended to sue the entity liable for KM Printing's sales of infringing products, which, by virtue of a merger one month prior to Screentone's filing, turned out to be KM Business. To side with KM Business, however, is to elevate form over substance.

A Southern District of Texas case with similar facts is instructive. In *Infotronics Corp. v. Varian Assoc. Corp.*, 45 F.R.D. 91, 93-94 (S.D. Tex. 1968), the court granted plaintiff's request to change the name of the defendant in a patent infringement suit to the company into which the defendant was merged just prior to the institution of suit:

---

[31] See Snypp/APAC Agreement (Case 601, D.I. 20-2, Exh. 8) at 1, 7.

> Plaintiff's claim has not been altered; plaintiff seeks merely to
> change the name of the defendant. The [parent corporation]
> received the same notice of the claim that it would have received
> had it been properly named. Finally, having expressly assumed all
> obligations of [the subsidiary], [the parent corporation] can hardly
> argue that it was unaware that the party sought to be sued was
> itself.  On these facts, the court finds that since [the parent
> corporation] has suffered no prejudice from the misnomer in the
> complaint, plaintiff's leave to amend must be granted.

*Id*. at 93-94 (emphasis added).  The court noted that additional "circumstances bolster this

conclusion." *Id*. at 94, n.6. For instance, prior to the subsidiary's answer date, the parent

corporation filed a declaratory judgment action in a different jurisdiction seeking invalidity of

the same patents. *Id*.[32]  Moreover, the parent corporation did not deny that the "same persons

who had been operating in the name of [the subsidiary] are performing the same functions at the

same location in the name of [the parent]."  *Id*.

    The same conclusion is warranted here where, among other things: (i) Screentone's

Texas claim has not been altered; (ii) KM Business received the same notice of Screentone's

claim that it would have received had it been properly named; (iii) KM Business admits that it is

the "successor in interest to KM Printing"[33] and has not alleged any operational changes;  (iv)

KM Business filed the instant declaratory judgment action seeking to invalidate the '809 patent,

which suit was occasioned by Screentone's Texas suit; and (v) KM Business has suffered no

prejudice, nor has any prejudice been alleged.

    Lastly, KM Business improperly assumes that the only time a court may permit

amendment of a pleading based on a misnomer is when the misnomer is deemed a "clerical or

---

[32] Besides granting leave to amend the complaint, the *Infotronics Corp.* court denied the defendant's motion to transfer the case to the court where the declaratory judgment action was filed.  *Id*. at 94.

[33] Presumably, this includes KM Business's assumption of KM Printing's liability for infringements committed prior to the date of merger.

typographical" error.  Rule 15 is not so narrow.  "Rule 15(c) was amended for the purpose of

preventing unjust results when a plaintiff, confronted with a maze of closely related corporate or

governmental entities, initially chooses the wrong one to sue, unless prejudice [to the added

defendant] exists." *Findley v. City of Baton Rouge*, 570 So. 2d 1168, 1171-72 (La. 1990)

(discussing purpose of federal rule and explaining that prejudice is the fundamental

consideration).

III.    **Transfer to the Texas Court is justified by the first-to-file rule *and* under the §1404(a) convenience factors.**

   A.    **Transfer to Texas is proper under the first-to-file rule, as applied by this Court.**

The so-called § 1404(a) "convenience factors" are not the only basis on which to transfer

a case.  To the contrary, Screentone relies on the first-to-file rule — a rule of comity inherent in

the 1404(a) analysis — as its primary basis for transfer.[34]  The various Texas defendants are now

arguing in three different courts — the Eastern District of Texas, the District of Delaware, and

the Western District of Washington — that their chosen forum is "clearly" the appropriate forum

in which to proceed.[35]  It is precisely this sort of "clarity" that the first-to-file rule was designed

to address.

Under 28 U.S.C. § 1404(a), the court may transfer a civil action "for the convenience of

parties and witnesses, in the interest of justice . . . to any other district . . . where it might have

been brought."  28 U.S.C. § 1404(a).  But the federal courts have consistently emphasized that "a

plaintiff's choice of venue should not be lightly disturbed."  *See, e.g., Bank of Am., N.A. v. Every*

---

[34] *See generally* Defendants' Opening Brief in Support of their Motion to Stay or Transfer Pending Resolution of Issues by the Eastern District of Texas, the First-Filed Court, or, in the Alternative, Motion to Dismiss (Case 601, D.I. 18; Case 602, D.I. 17) at 1-2, 5-9, quoting *Dippold-Harmon Enters., Inc. v Lowe's Companies, Inc.*, No. 01-532-GMS, 2001 U.S. Dist. LEXIS 18547 at *13-14 (D. Del. Nov. 13, 2001) ("[the] later-filed action should be stayed pending the resolution of an earlier filed action, or transferred to the court in which the earlier-filed action is pending").

[35] *See, e.g.*, Heidelberg's Response (Case 601, D.I. 19) at 10.

*Penny Counts, Inc.*, No. 07-159-GMS, 2007 U.S. Dist. LEXIS 67107, *4-6 (D. Del. Sept. 11, 2007) (quoting *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995)).

When considering a motion to transfer, the court must determine "whether on balance the litigation would more conveniently proceed and the interest of justice be better served by transfer to a different forum." *Id.*, quoting *Jumara*, 55 F.3d at 879. This inquiry requires "a multi-factor balancing test," embracing not only the statutory criteria of the interests of justice and the convenience of the parties and witnesses, but all relevant factors, including certain private and public interests. *Id.*, quoting *Jumara* at 875. The factors are sometimes referred to collectively as the "convenience factors," or, in the Third Circuit, the "*Jumara* factors."

These private interests include the plaintiff's choice of forum; the defendant's preference; whether the claim arose elsewhere; the convenience of the parties; the convenience of the expected witnesses; and the location of books and records, to the extent that they could not be produced in the alternative forum. *Id.* Among the relevant public interests are: "the enforceability of the judgment; practical considerations that could make the trial easy, expeditious, or inexpensive; the relative administrative difficulty in the two fora resulting from court congestion; the local interest in deciding local controversies at home; [and] the public policies of the fora." *Id.*, quoting *Jumara* at 879-80.

When the "interests of justice" weigh heavily in favor of transfer, an in-depth analysis of the private and public interest factors is not always necessary. The *Bank of America* case is a case in point. In that case, Every Penny Counts, Inc. ("EPC") filed a patent infringement suit against Bank of America Corporation ("BAC") and VISA in the Middle District of Florida. *Bank of Am., N.A. v. Every Penny Counts, Inc.*, No. 07-159-GMS, 2007 U.S. Dist. LEXIS 67107, *1-2 (D. Del. Sept. 11, 2007). Less than two months later, Bank of America, N.A. ("BANA")

14

filed a declaratory judgment action in the District of Delaware, seeking a declaration of invalidity and non-infringement. *Id.* at *1. The next day, EPC amended its complaint in the Florida Action to add BANA as a defendant. *Id.* at *2. Less than three weeks after that, BANA filed a motion in the Florida Action to transfer that case from the Middle District of Florida to the District of Delaware. EPC then moved to Dismiss, Stay, or Transfer the Delaware action.

This Court agreed with EPC that BANA's second-filed declaratory judgment action was "an attempt to deprive EPC of its chosen forum in the Florida Action," and granted EPC's request for a transfer "based upon the rule of comity among federal courts, otherwise known as the 'first-to-file rule.'" *Id.* at *2, 6. This Court emphasized that "[i]n patent cases, the Federal Circuit applies the general rule favoring the forum of the first-filed case, unless considerations of judicial and litigant economy, and the just and effective disposition of disputes, requires otherwise." *Id.* at *6-7, quoting *Electronics for Imaging, Inc. v. Coyle*, 394 F.3d 1341, 1347 (Fed. Cir. 2005) (internal quotations omitted).

BANA defended its procedural games by arguing that the Florida Action lacked a "necessary party." *Id.* at *8. This Court rejected BANA's arguments:

> With the institution of a separate action in this court, BANA essentially asks this court to substitute its judgment for that of the first-filed Florida court on the scope of the Florida court's jurisdiction. It would be presumptuous for this court to make such a determination, particularly while BANA's motion to transfer is still pending in the Florida Action. Furthermore, given the similarities between the issues underlying the Florida Action and those underlying the present action, allowing both cases to proceed concurrently would be both inconvenient to the parties and an inefficient use of judicial resources.

*Id.* at *7. Citing concerns about "the possibility of inconsistent rulings [and] duplication of judicial effort," the Court emphasized "the deference given to the first filed case," and explained that the first-filed court was the appropriate court to consider any questions about the propriety

15

of joining additional parties. *Id.* at *8-9 (citations omitted). Finally, the Court agreed that the first-filed court should be the one to decide "whether an exception to the first-filed rule applies." *Id.* at *9 (citations omitted).

> **B.** **The Section 1404(a) "convenience factors" favor transfer to Texas.**

In light of the above, Screentone respectfully submits that this Court should defer to the Texas Court for any further analysis of the public and private interest factors, which have been briefed extensively in the Texas Action. Nevertheless, out of an abundance of caution, Screentone offers five factors in defense of Screentone's choice of a Texas forum.

First, as reference above, Screentone chose the Eastern District of Texas and desires to litigate there. The plaintiff's choice of forum is "a paramount consideration in any determination of a transfer request," and "[u]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Young v. Armstrong World Indus., Inc.*, 601 F. Supp. 399, 401 (N.D. Tex. 1984) (citation omitted). Notably, "the patent venue statute is much more expansive than the general venue statute and gives a plaintiff broader discretion in where the plaintiff chooses to bring the suit." *Network-1 Sec. Solutions, Inc. v. D-Link Corp.*, 433 F. Supp. 2d 795, 799 (E.D. Tex. 2006) (citations omitted).

Second, Plaintiffs engage in infringing activity in the Eastern District of Texas — a significant point that Plaintiffs do not dispute.[36] Third, Screentone's parent, APAC, maintains a constant presence in this Eastern District of Texas, having an office located in Frisco where it conducts a substantial amount of business.[37] Fourth, the Eastern District of Texas is the most

---

[36] Heidelberg's Response (Case 601, D.I. 19) at 10 (admitting that it "conducts business in the State of Texas"); KM Business's Response (Case 602, D.I. 18) at 17 (same).

[37] Exh. C, Declaration of Clayton J. Haynes, previously filed by Screentone in the Texas Action under the title "Declaration of Clayton J. Haynes in Support of Plaintiff's Sur Reply in Opposition to Defendants' Motions to Dismiss or Transfer" (hereinafter Haynes Decl.) at ¶ 2. Note that Plaintiffs assert in their Motions that APAC is an

centrally located forum of the three that are currently "in the running." Fifth, Screentone has undertaken extensive work to comply with the Texas Court's local rules regarding the preparation of its infringement disclosures involving multiple parties, each with multiple accused products. Given that the disclosures are due ten days after the Texas Court's Case Management Conference, such early effort has been necessary.

On a final note, Plaintiffs argue that Delaware is the most appropriate forum because certain named defendants, including Acacia Research Corporation ("ARC"), are Delaware corporations. But ARC has absolutely nothing to do with this case, except that it is the ultimate parent of APAC. ARC does not own, nor has it ever owned, any interest in the '809 patent. The improper joinder of a Delaware corporation cannot be used to support a transfer to Delaware.

<u>**CONCLUSION**</u>

This Court should stay the instant proceedings, as requested by both Screentone and Heidelberg, or transfer the cases to the Eastern District of Texas for resolution. Transfer to the Texas Court is appropriate because: (1) Screentone had standing to file its Texas Action; (2) Screentone has taken remedial steps in the Texas Court to name the correct Konica Minolta entity; and (3) the first-to-file rule and the 1404(a) convenience factors favor transfer to Texas.

Respectfully submitted,

Dated: December 20, 2007

/s/ Karen V. Sullivan
Karen V. Sullivan (No. 3872)
OBERLY, JENNINGS & RHODUNDA, P.A.
1220 Market Street, Suite 710
P.O. Box 2054
Wilmington, DE 19899
(302) 576-2000 – Telephone
(302) 576-2004 – Facsimile
ksullivan@ojlaw.com

---

indispensable party. Note also that Screentone has sought leave to add APAC as a party plaintiff to the Texas Action.

Edward R. Nelson III
Texas State Bar No. 00797142
David Skeels
Texas State Bar No.  24041925
FRIEDMAN, SUDER & COOKE
604 East 4th Street, Suite 200
Fort Worth, TX 76102
(817) 334-0400 – Telephone
(817) 334-0401 – Facsimile

Attorneys for Defendants Screentone Systems
Corporation, Acacia Patent Acquisition
Corporation, Acacia Research Corporation and
Paul S. Snypp

18

# EXHIBIT
# A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| SCREENTONE SYSTEMS CORPORATION, | § § § | |
| Plaintiff, | § § § | |
| v. | § § | CIVIL ACTION NO. 2:07cv340-DF |
| CANON U.S.A., INC., EASTMAN KODAK COMPANY, PANASONIC CORPORATION OF NORTH AMERICA, RICOH AMERICAS CORPORATION, KONICA MINOLTA PRINTING SOLUTIONS U.S.A., INC., KYOCERA MITA AMERICA, INC., and HEIDELBERG USA, INC., | § § § § § § § § § | **JURY TRIAL DEMANDED** |
| Defendants. | § § | |

## DECLARATION OF PAUL SNYPP IN SUPPORT OF PLAINTIFF'S SURREPLY IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS OR TRANSFER

1.    My name is Paul Snypp. I am over the age of twenty-one and am in all respects competent to make this declaration. I have personal knowledge of the matters set forth below, and the factual matters set forth below are true and correct.

2.    I co-founded SeeColor Corporation ("SeeColor") and served as an officer, as a member of the board of directors, and as the company's registered agent.

3.    If the Court deems it necessary, I am willing to voluntarily be joined as a Plaintiff in this action currently pending in the Eastern District of Texas. In addition, if needed, I am willing to travel to the Eastern District of Texas to testify at trial. Traveling to the Eastern District of Texas will not be an inconvenience.

4.    Attached as Exhibit 1 to this declaration is a true and correct copy of the Bylaws of SeeColor Corporation as amended in their entirety on June 29, 1988.

1

5.      Attached as Exhibit 2 to this declaration is a true and correct copy of the Board Meeting Minutes from the October 8, 2003 meeting of the SeeColor Board of Directors.

6.      Ever since SeeColor and I executed the Repossession and Disposition Agreement having an effective date of October 21, 2003, I have been solely responsible for, and have made, the required maintenance fee payments on the '809 patent.  At my direction, this task has been carried out by the law firm of Christensen, O'Connor, Johnson, & Kindness.  Attached as Exhibit 3 to this declaration are true and correct copies of maintenance fee payment information from the Patent Office website.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this the 30th day of October, 2007.

PAUL SNYPP

2

# EXHIBIT 1

BYLAWS

OF

SEECOLOR CORPORATION

Adopted:  October 29, 1987

Amended in Entirety:  June 29, 1988

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| ARTICLE I | Registered Office and Registered Agent . . | 1 |
| ARTICLE II | Shareholders' Meetings . . . . . . . . . | 1 |
| Section 1 | Annual Meetings . . . . . . . . . . | 1 |
| Section 2 | Special Meetings . . . . . . . . . . | 1 |
| Section 3 | Notice of Meetings . . . . . . . . . | 1 |
| Section 4 | Waiver of Notice . . . . . . . . . . | 2 |
| Section 5 | Quorum and Adjourned Meetings . . . . . | 2 |
| Section 6 | Proxies . . . . . . . . . . . . . . | 2 |
| Section 7 | Voting Record . . . . . . . . . . . | 2 |
| Section 8 | Voting of Shares . . . . . . . . . . | 3 |
| Section 9 | Closing of Transfer Books . . . . . . | 3 |
| ARTICLE III | Directors . . . . . . . . . . . . . . | 3 |
| Section 1 | General Powers . . . . . . . . . . . | 3 |
| Section 2 | Number . . . . . . . . . . . . . . | 3 |
| Section 3 | Tenure and Qualifications . . . . . . | 4 |
| Section 4 | Election . . . . . . . . . . . . . . | 4 |
| Section 5 | Vacancies . . . . . . . . . . . . . | 4 |
| Section 6 | Resignation . . . . . . . . . . . . | 4 |
| Section 7 | Removal of Directors . . . . . . . . | 4 |
| Section 8 | Meetings . . . . . . . . . . . . . . | 4 |
| Section 9 | Quorum and Voting . . . . . . . . . . | 5 |
| Section 10 | Compensation . . . . . . . . . . . . | 5 |
| Section 11 | Presumption of Assent . . . . . . . . | 5 |
| Section 12 | Executive and Other Committees . . . . . | 5 |
| ARTICLE IV | Special Measures for Corporate Action . . | 6 |
| Section 1 | Actions by Written Consent . . . . . . | 6 |
| Section 2 | Meetings by Conference Telephone . . . . | 6 |
| ARTICLE V | Officers . . . . . . . . . . . . . . | 6 |
| Section 1 | Officers Designated . . . . . . . . . | 6 |
| Section 2 | Election, Qualification and Term of Office . . . . . . . . . . . . . | 7 |
| Section 3 | Powers and Duties . . . . . . . . . . | 7 |
| Section 4 | Assistant Secretaries and Assistant Treasurers . . . . . . . . . | 8 |
| Section 5 | Removal . . . . . . . . . . . . . . | 8 |
| Section 6 | Vacancies . . . . . . . . . . . . . | 8 |
| Section 7 | Salaries . . . . . . . . . . . . . . | 8 |

                                                            Page

       ARTICLE VI      Share Certificates . . . . . . . . . . . .      8

            Section 1   Issuance, Form and Execution of
                        Certificates . . . . . . . . . . . . . . .     8
            Section 2   Transfers . . . . . . . . . . . . . . . . .    9
            Section 3   Loss or Destruction of Certificates . .       9

       ARTICLE VII     Books and Records . . . . . . . . . . . .      9

            Section 1   Books of Account, Minutes, and
                        Share Register . . . . . . . . . . . . . .    9
            Section 2   Copies of Resolutions . . . . . . . . .       9

       ARTICLE VIII    Corporate Seal . . . . . . . . . . . . . .    10

       ARTICLE IX      Loans . . . . . . . . . . . . . . . . . .     10

       ARTICLE X       Amendment of Bylaws . . . . . . . . . . .     10

            Section 1   By the Shareholders . . . . . . . . . .      10
            Section 2   By the Board of Directors . . . . . . .      10

       ARTICLE XI      Fiscal Year . . . . . . . . . . . . . . .     10

       ARTICLE XII     Rules of Order . . . . . . . . . . . . . .    11

BYLAWS

OF

SEECOLOR CORPORATION

ARTICLE I

Registered Office and Registered Agent

The registered office of the corporation shall be located in the State of Washington at such place as may be fixed from time to time by the board of directors upon filing of such notices as may be required by law, and the registered agent shall have a business office identical with such registered office. Any change in the registered agent or registered office shall be effective upon filing such change with the office of the Secretary of State of the State of Washington.

ARTICLE II

Shareholders' Meetings

Section 1. Annual Meetings. The annual meeting of the shareholders of this corporation, for the purpose of election of directors and for such other business as may come before it, shall be held at the registered office of the corporation, or such other place as may be designated by the notice of the meeting, on the 1st day of April of each and every year, at 10:00 a.m., but in case such day shall be a legal holiday, the meeting shall be held at the same hour and place on the next succeeding day not a holiday.

Section 2. Special Meetings. Special meetings of the shareholders of this corporation may be called at any time by the holders of 10% of the voting shares of the corporation, or by the president, or by a majority of the board of directors. No business shall be transacted at any special meeting of shareholders except as is specified in the notice calling for said meeting. The board of directors may designate any place as the place of any special meeting called by the president or the board of directors, and special meetings called at the request of shareholders shall be held at such place as may be determined by the board of directors and placed in the notice of such meetings.

Section 3. Notice of Meetings. Written notice of annual or special meetings of shareholders stating the place, day, and hour of the meeting, and, in the case of a special meeting, the

purpose or purposes for which the meeting is called, shall be given by the secretary or persons authorized to call the meeting to each shareholder of record entitled to vote at the meeting. Such notice shall be given not less than ten (10) nor more than sixty (60) days prior to the date of the meeting, either personally or by mail. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail addressed to the shareholder at his address as it appears on the stock transfer books of the corporation.

Section 4. <u>Waiver of Notice</u>. Notice of the time, place, and purpose of any meeting may be waived in writing (either before or after such meeting) and will be waived by any shareholder by his attendance thereat in person or by proxy. Any shareholder so waiving shall be bound by the proceedings of any such meeting in all respects as if due notice thereof had been given.

Section 5. <u>Quorum and Adjourned Meetings</u>. A majority of the outstanding shares of the corporation entitled to vote, represented in person or by proxy, shall constitute a quorum at a meeting of shareholders. A majority of the shares represented at a meeting, even if less than a quorum, may adjourn the meeting from time to time without further notice. At such reconvened meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally notified. The shareholders present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough shareholders to leave less than a quorum.

Section 6. <u>Proxies</u>. At all meetings of shareholders, a shareholder may vote by proxy executed in writing by the shareholder or by his duly authorized attorney in fact. Such proxy shall be filed with the secretary of the corporation before or at the time of the meeting. No proxy shall be valid after eleven (11) months from the date of its execution, unless otherwise provided in the proxy.

Section 7. <u>Voting Record</u>. At least ten (10) days before each meeting of shareholders, a complete record of the shareholders entitled to vote at such meeting, or any adjournment thereof, shall be made, arranged in alphabetical order, with the address of and number of shares held by each, which record shall be kept on file at the registered office of the corporation for a period of ten (10) days prior to such meeting. The record shall be kept open at the time and place of such meeting for the inspection of any shareholder.

7647X                                    2

Section 8.  <u>Voting of Shares</u>.  Except as otherwise provided in the Articles of Incorporation or in these Bylaws, every shareholder of record shall have the right at every shareholders' meeting to one vote for every share standing in his name on the books of the corporation, and the affirmative vote of a majority of the shares represented at a meeting and entitled to vote thereat shall be necessary for the adoption of a motion or for the determination of all questions and business which shall come before the meeting.

Section 9.  <u>Closing of Transfer Books</u>.  For the purpose of determining shareholders entitled to notice of or to vote at any meeting of shareholders, or any adjournment thereof, or entitled to receive payment of any dividend, the board of directors may provide that the stock transfer books shall be closed for a stated period not to exceed sixty (60) days nor less than ten (10) days preceding such meeting.  In lieu of closing the stock transfer books, the board of directors may fix in advance a record date for any such determination of shareholders, such date to be not more than sixty (60) days and, in case of a meeting of shareholders, not less than ten (10) days prior to the date on which the particular action requiring such determination of shareholders is to be taken. If the stock transfer books are not closed and no record date is fixed for the determination of shareholders entitled to notice of or to vote at a meeting of shareholders, or shareholders entitled to receive payment of a dividend, the date on which notice of the meeting is mailed or the date on which the resolution of the board of directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of shareholders.  When a determination of shareholders entitled to vote at any meeting of shareholders has been made as provided in this section, such determination shall apply to any adjournment thereof.

ARTICLE III

<u>Directors</u>

Section 1.  <u>General Powers</u>.  All corporate powers shall be exercised by or under the authority of, and the business and affairs of the corporation shall be managed under the direction of, the board of directors except as otherwise provided by the laws under which this corporation is formed or in the Articles of Incorporation.

Section 2.  <u>Number</u>.  The number of directors of the corporation shall be composed of not fewer than three nor more than nine directors, the specific number to be set by resolution of the board of directors or the shareholders.  The number of directors can be increased or decreased by a resolution of the shareholders, provided that no decrease shall have the effect of shortening the term of any incumbent director.
7647X

3

Section 3. <u>Tenure and Qualifications</u>. Each director shall hold office until the next annual meeting of shareholders and until his successor shall have been elected and qualified. Directors need not be residents of the state or shareholders of the corporation.

Section 4. <u>Election</u>. The directors shall be elected by the shareholders at their annual meeting each year; and if, for any cause, the directors shall not have been elected at an annual meeting, they may be elected at a special meeting of shareholders called for that purpose in the manner provided by these Bylaws.

Section 5. <u>Vacancies</u>. In case of any vacancy in the board of directors, the remaining directors, whether constituting a quorum or not, may elect a successor to hold office for the unexpired portion of the term of the director whose place shall be vacant and until his successor shall have been duly elected and qualified.

Section 6. <u>Resignation</u>. Any director may resign at any time by delivering written notice to the secretary of the corporation.

Section 7. <u>Removal of Directors</u>. At a meeting of shareholders called expressly for that purpose, the entire board of directors, or any member thereof, may be removed, with or without cause, by a vote of the holders of a majority of shares then entitled to vote at an election of such directors.

Section 8. <u>Meetings</u>.

(a) The annual meeting of the board of directors shall be held immediately after the annual shareholders' meeting at the same place as the annual shareholders' meeting or at such other place and at such time as may be determined by the directors. No notice of the annual meeting of the board of directors shall be necessary.

(b) Special meetings may be called at any time and place upon the call of the president, secretary, or any one director. Notice of the time and place of each special meeting shall be given by the secretary, or the persons calling the meeting, by mail, radio, telegram, or by personal communication by telephone or otherwise at least three (3) days in advance of the time of the meeting. The purpose of the meeting need not be given in the notice. Notice of any special meeting may be waived in writing or by telegram (either before or after such meeting) and will be waived by any director by attendance thereat.

7647X

4

(c)   Regular meetings of the board of directors shall be held at such place and on such day and hour as shall from time to time be fixed by resolution of the board of directors. No notice of regular meetings of the board of directors shall be necessary.

(d)   At any meeting of the board of directors, any business may be transacted, and the board may exercise all of its powers.

Section 9.   Quorum and Voting.

(a)   A majority of the directors presently in office shall constitute a quorum, but a lesser number may adjourn any meeting from time to time until a quorum is obtained, and no further notice thereof need be given.

(b)   At each meeting of the board at which a quorum is present, the act of a majority of the directors present at the meeting shall be the act of the board of directors.   The directors present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough directors to leave less than a quorum.

Section 10.   Compensation.   By resolution of the board of directors, the directors may be paid their expenses, if any, of attendance at each meeting of the board of directors and may be paid a fixed sum for attendance at each meeting of the board of directors or a stated salary as director.   No such payment shall preclude any director from serving the corporation in any other capacity and receiving compensation therefor.

Section 11.   Presumption of Assent.   A director of the corporation who is present at a meeting of the board of directors at which action on any corporate matter is taken shall be presumed to have assented to the action taken unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as the secretary of the meeting before the adjournment thereof or shall forward such dissent by registered mail to the secretary of the corporation immediately after the adjournment of the meeting.   Such right to dissent shall not apply to a director who voted in favor of such action.

Section 12.   Executive and Other Committees.   The board of directors, by resolution adopted by a majority of the full board of directors, may designate from among its members an executive committee and one or more other committees each of which, to the extent provided in such resolution, shall have and may exercise all the authority of the board of directors,

7647X                                           5

except that no such committee shall have the authority to: declare dividends or distributions, except at the rate or in periodic amount determined by the board of directors; approve or recommend to shareholders actions or proposals required by the laws under which this corporation is formed to be approved by shareholders; fill vacancies on the board of directors or any committee thereof; amend the Bylaws; authorize or approve the reacquisition of shares unless pursuant to a general formula or method approved by the board of directors; fix compensation of any director for serving on the board of directors or on any committee; approve a plan of merger, consolidation, or exchange of shares not requiring shareholder approval; reduce earned or capital surplus; or, appoint other committees of the board of directors or the members thereof.

ARTICLE IV

Special Measures for Corporate Action

Section 1. Actions by Written Consent. Any corporate action required or permitted by the Articles of Incorporation, Bylaws, or the laws under which this corporation is formed, to be voted upon or approved at a duly called meeting of the directors, committee of directors, or shareholders may be accomplished without a meeting if unanimous consent of the respective directors or shareholders, setting forth the actions so taken, shall be signed by all the directors, committee members, or shareholders, as the case may be.

Section 2. Meetings by Conference Telephone. Members of the board of directors, members of a committee of directors, or shareholders may participate in their respective meetings by means of a conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other at the same time; participation in a meeting by such means shall constitute presence in person at such meeting.

ARTICLE V

Officers

Section 1. Officers Designated. The officers of the corporation shall be a president, one or more vice presidents (the number thereof to be determined by the board of directors), a secretary, and a treasurer, each of whom shall be elected by the board of directors. Such other officers and assistant officers as may be deemed necessary may be elected or appointed by the board of directors. Any two or more offices may be held by the same person, except the offices of president

and secretary; provided, however, that if there is only one shareholder, all corporate offices can be held by one individual.

The board of directors may, in its discretion, elect a chairman of the board of directors; and, if a chairman has been elected, he shall, when present, preside at all meetings of the board of directors and the shareholders and shall have such other powers as the board may prescribe.

Section 2.  Election, Qualification and Term of Office. Each of the officers shall be elected by the board of directors.  None of said officers, except the president and the chairman of the board of directors, need be a director, but a vice president who is not a director cannot succeed to or fill the office of president.  The officers shall be elected by the board of directors at each annual meeting of the board of directors.  Except as hereinafter provided, each of said officers shall hold office from the date of his election until the next annual meeting of the board of directors and until his successor shall have been duly elected and qualified.

Section 3.  Powers and Duties.

(a)  President.  The president shall be the chief executive officer of the corporation and, subject to the direction and control of the board of directors, shall have general charge and supervision over its property, business, and affairs.  He shall, unless a chairman of the board of directors has been elected and is present, preside at meetings of the shareholders and the board of directors.

(b)  Vice President.  In the absence of the president or his inability to act, the senior vice president shall act in his place and stead and shall have all the powers and authority of the president, except as limited by resolution of the board of directors.

(c)  Secretary.  The secretary shall:  (1) keep the minutes of the shareholders' and of the board of directors' meetings in one or more books provided for that purpose; (2) see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law; (3) be custodian of the corporate records and of the seal of the corporation and affix the seal of the corporation to all documents as may be required; (4) keep a register of the post office address of each shareholder which shall be furnished to the secretary by such shareholder; (5) sign with the president, or a vice president, certificates for shares of the corporation, the issuance of which shall have been authorized

7647X                                    7

by resolution of the board of directors; (6) have general charge of the stock transfer books of the corporation; and (7) in general perform all duties incident to the office of secretary and such other duties as from time to time may be assigned to him by the president or by the board of directors.

(d) <u>Treasurer</u>. Subject to the direction and control of the board of directors, the treasurer shall have the custody, control, and disposition of the funds and securities of the corporation and shall account for the same; and, at the expiration of his term of office, he shall turn over to his successor all property of the corporation in his possession.

Section 4. <u>Assistant Secretaries and Assistant Treasurers</u>. The assistant secretaries, when authorized by the board of directors, may sign with the president, or a vice president, certificates for shares of the corporation, the issuance of which shall have been authorized by resolution of the board of directors. The assistant treasurers shall, respectively, if required by the board of directors, give bonds for the faithful discharge of their duties in such sums and with such sureties as the board of directors shall determine. The assistant secretaries and assistant treasurers, in general, shall perform such duties as shall be assigned to them by the secretary or the treasurer, respectively, or by the president or the board of directors.

Section 5. <u>Removal</u>. The board of directors shall have the right to remove any officer whenever in its judgment the best interests of the corporation will be served thereby.

Section 6. <u>Vacancies</u>. The board of directors shall fill any office which becomes vacant with a successor who shall hold office for the unexpired term and until his successor shall have been duly elected and qualified.

Section 7. <u>Salaries</u>. The salaries of all officers of the corporation shall be fixed by the board of directors.

ARTICLE VI

<u>Share Certificates</u>

Section 1. <u>Issuance, Form and Execution of Certificates</u>. No shares of the corporation shall be issued unless authorized by the board. Such authorization shall include the maximum number of shares to be issued and the consideration to be received for each share and the value of noncash consideration. Certificates for shares of the corporation shall be in such form as is consistent with the provisions of the corporation laws of the State of Washington and shall state:

7647X                                  8

(a)    That the corporation is organized under the laws of this state;

(b)    The name of the person to whom issued; and

(c)    The number and class of shares and the designation of the series, if any, which such certificate represents.

They shall be signed by the president and by the secretary or assistant secretary, and the seal of the corporation may be affixed thereto.  Certificates may be issued for fractional shares.  No certificate shall be issued for any share until the consideration established for its issuance has been paid.

Section 2.    Transfers.  Shares may be transferred by delivery of the certificate therefor, accompanied either by an assignment in writing on the back of the certificate or by a written power of attorney to assign and transfer the same, signed by the record holder of the certificate.  The board of directors may, by resolution, provide that beneficial owners of shares shall be deemed holders of record for certain specified purposes.  Except as otherwise specifically provided in these Bylaws, no shares shall be transferred on the books of the corporation until the outstanding certificate therefor has been surrendered to the corporation.

Section 3.    Loss or Destruction of Certificates.  In case of loss or destruction of any certificate of shares, another may be issued in its place upon proof of such loss or destruction and upon the giving of a satisfactory indemnity bond to the corporation.  A new certificate may be issued without requiring any bond, when in the judgment of the board of directors it is proper to do so.

ARTICLE VII

Books and Records

Section 1.    Books of Accounts, Minutes, and Share Register.  The corporation shall keep complete books and records of accounts and minutes of the proceedings of the board of directors and shareholders and shall keep at its registered office, principal place of business, or at the office of its transfer agent or registrar a share register giving the names of the shareholders in alphabetical order and showing their respective addresses and the number of shares held by each.

Section 2.    Copies of Resolutions.  Any person dealing with the corpora

7647X                                        9

the proceedings, resolutions, or votes of the board of
directors or shareholders, when certified by the president or
secretary.

## ARTICLE VIII

### Corporate Seal

The board of directors may provide for a corporate seal
which shall have inscribed thereon the name of the corporation,
the year and state of incorporation and the words "corporate
seal."

## ARTICLE IX

### Loans

The corporation may not lend money to or guarantee the
obligation of a director of the corporation unless:

(a)  The particular loan or guarantee is approved by
vote of the holders of at least a majority of the votes
represented by the outstanding voting shares of all classes,
except the votes of the benefited director; or

(b)  The board of directors determines that the loan
or guarantee benefits the corporation and either approves the
specific loan or guarantee or a general plan authorizing loans
and guarantees.

## ARTICLE X

### Amendment of Bylaws

Section 1.  By the Shareholders.  These Bylaws may be
amended, altered, or repealed at any regular or special meeting
of the shareholders if notice of the proposed alteration or
amendment is contained in the notice of the meeting.

Section 2.  By the Board of Directors.  These Bylaws may be
amended, altered, or repealed by the affirmative vote of a
majority of the whole board of directors at any regular or
special meeting of the board.

## ARTICLE XI

### Fiscal Year

The fiscal year of the corporation shall be set by
resolution of the board of directors.

7647X                                    10

## ARTICLE XII

### Rules of Order

The rules contained in the most recent edition of Robert's Rules of Order, Newly Revised, shall govern all meetings of shareholders and directors where those rules are not inconsistent with the Articles of Incorporation, Bylaws, or special rules of order of the corporation.

7647X

**EXHIBIT 2**

P.01

Meeting of SeeColor Board of Directors:  Board Meeting Minutes
October 8th, 2003  1:10 PM

Chairman (Craig Surbrook) calls Board meeting to order.

Duly noted that notice of Board meeting, as required by SeeColor's By-Laws, has
been given by the President (Ron LaForge).
> Board member Ed Dennis' meeting notice returned "undeliverable".
> Board member Peter Rettman's meeting notice returned
> "undeliverable". A voice mail notification of the meeting was also
> left on his office telephone. He did not return the call.

First item of business:  To determine the response by SeeColor Corporation to a
complaint filed by Paul Snypp demanding full payment on his secured note.

Discussion of three possible responses:
1. Agree to the claims in the complaint.
2. Contest any or all of the claims in the complaint.
3. No response.

Davis, Wright, Tremain (SeeColor's attorneys) have told us that Snypp's UCC
filing is valid and that the claims (in their view) are consistent with his signed
Agreement with SeeColor Corporation.

A motion was made and seconded to adopt the following resolution:

"It is hereby resolved that SeeColor's Board of Director's agrees with the validity
of the claims in the complaint "Snypp vs. SeeColor" and directs its Corporate
Counsel to stipulate to the Plaintiff that the Board agrees with all of the claims in
the complaint".

The motion was carried. Three yea votes:  Ron, Craig and Paul (Paul stated that
if he's not supposed to give a yea, then consider his vote an abstain).

There was no additional business to be discussed. The meeting was adjourned
at 1:30 PM.

Craig L. Surbrook, Chairman / Secretary

Ronald D. LaForge, President

Paul Snypp, Board Member

SIGNATURE(S) OF DEBTOR(S) (or assignor(s)
WASHINGTON UCC ;    SIGNATURE(S) OF SECURED PARTY(IES) (or assignee(s))
FORM APPROVED FOR USE IN THE STATE OF WASHINGTON

**EXHIBIT 3**

USPTO : Patent Bibliographic Data (Patent Number: 5166809) - Microsoft Internet Explorer

File  Edit  View  Favorites  Tools  Help

Back ▼  |  ✕  |  🔍 Search  ⭐ Favorites  |  ...

Address 🔗 https://ramps.uspto.gov/eram/getMaintFeesInfo.do;jsessionid=0000-CQ4Deh3aaVMuO75RJs-2Ud.11g1096Sf    ▼  | 🔳 Go    Links »

Google: G ▼ dean pelletier    ▼ Go ⚙ ▼ 🔖 Bookmarks ▼  | 🔲 1 blocked  🔲 Send to ▼  ✎ 🔍 dean  »

# United States Patent and Trademark Office

## Patent Bibliographic Data                                    10/26/2007 02:47 PM

| | | | |
|---|---|---|---|
| **Patent Number:** | 5166809 | **Application Number:** | 07521080 |
| **Issue Date:** | 11/24/1992 | **Filing Date:** | 05/08/1990 |
| **Title:** | APPARATUS AND METHODS FOR DIGITAL HALFTONING | | |
| **Status:** | 4th, 8th and 12th year fees paid | **Entity:** | Small |
| **Window Opens:** | N/A | **Surcharge Date:** | N/A | **Expiration:** | N/A |
| **Fee Amt Due:** | Window not open | **Surchg Amt Due:** | Window not open | **Total Amt Due:** | Window not open |

**Fee Code:**

**Surcharge Fee Code:**

**Most recent events (up to 7):**  05/27/2004    Payor Number Assigned.
05/18/2004    Payment of Maintenance Fee, 12th Yr, Small Entity.
04/11/2000    Payment of Maintenance Fee, 8th Yr, Small Entity.
05/24/1996    Payment of Maintenance Fee, 4th Yr, Small Entity.
--- End of Maintenance History ---

**Address for fee purposes:**  CHRISTENSEN, O'CONNOR, JOHNSON, KINDNESS
1420 FIFTH AVENUE
SUITE 2800
SEATTLE, WA
981012347

Return To:

USPTO Home Page

Finance Online Shopping Page

[ Run Another Query ]

Done    🌐 Internet

🔳 start    ...    1:47 PM

United States
Patent and
Trademark Office

# Maintenance Fee Statement

10/26/2007 02:47 PM EDT

Patent Number: 5166809

Customer Number: 26389

CHRISTENSEN, O'CONNOR, JOHNSON, KINDNESS
1420 FIFTH AVENUE
SUITE 2800
SEATTLE WA 98101-2347

According to the records of the U.S. Patent and Trademark Office (USPTO), the maintenance fee and any necessary surcharge have been timely paid for the patent listed below. The "PYMT DATE" column indicates the payment date (i.e., the date the payment was filed).

The payment shown below is subject to actual collection. If the payment is refused or charged back by a financial institution, the payment will be void and the maintenance fee and any necessary surcharge unpaid.

Direct any questions about this statement to: Mail Stop M Correspondence, Director of the USPTO, P.O.Box 1450, Alexandria, VA 22313-1450.

| PATENT NUMBER | FEE AMT | SUR-CHARGE | PYMT DATE | U.S. APPLICATION NUMBER | PATENT ISSUE DATE | APPL. FILING DATE | PAYMENT YEAR | SMALL ENTITY? | ATTY DKT NUMBER |
|---|---|---|---|---|---|---|---|---|---|
| 5,166,809 | $495.00 | $0.00 | 05/24/96 | 07/521,080 | 11/24/92 | 05/08/90 | 04 | YES | SEEC15003 |

USPTO - Maintenance Fee Statement (Patent Number: 5166809) - Microsoft Internet Explorer

File    Edit    View    Favorites    Tools    Help

Back ▾    ×    ⟳    Search    ☆ Favorites    ◷    ☆    Links »    Settings ▾

Address 🔗 https://ramps.uspto.gov/eram/getMaintFeesInfo.do;jsessionid=0000-CQ4Deh3aaVMuO75RJa-2Udi11g1096Sf    ▾ 🔗 Go

Google 🔍 ▾ dean pelletier    ▾ Go ⬦ 🐷 ⬦ ☆ Bookmarks▾    🗐 1 blocked    💬 Check ▾    ᴬᴮꟿ Check ▾    AutoLink ▾    AutoFill    📤 Send to ▾    🔲 dean pelletier    »

## United States Patent and Trademark Office

# Maintenance Fee Statement

**10/26/2007 02:48 PM EDT**

Patent Number: 5166809

Customer Number: 26389

CHRISTENSEN, O'CONNOR, JOHNSON, KINDNESS
1420 FIFTH AVENUE
SUITE 2800
SEATTLE WA 98101-2347

According to the records of the U.S.Patent and Trademark Office (USPTO), the maintenance fee and any necessary surcharge have been timely paid for the patent listed below. The "PYMT DATE" column indicates the payment date (i.e., the date the payment was filed).

The payment shown below is subject to actual collection. If the payment is refused or charged back by a financial institution, the payment will be void and the maintenance fee and any necessary surcharge unpaid.

Direct any questions about this statement to: Mail Stop M Correspondence, Director of the USPTO, P.O.Box 1450, Alexandria, VA 22313-1450.

| PATENT NUMBER | FEE AMT | SUR-CHARGE | PYMT DATE | U.S. APPLICATION NUMBER | PATENT ISSUE DATE | APPL. FILING DATE | PAYMENT YEAR | SMALL ENTITY? | ATTY DKT NUMBER |
|---|---|---|---|---|---|---|---|---|---|
| 5,166,809 | $950.00 | $0.00 | 04:11:00 | 07:521,080 | 11:24:92 | 05:08:90 | 08 | YES | SEEC15003 |

Done    🔒 🌐 Internet

🔄 start    🐷 🔍 ◷    🖂 Inbox - Micros...    🐷 USPTO - Maint...    🖥 CT Summation ...    🐷 Adobe Acroba...    🔲 Microsoft Word    1:48 PM

United States
Patent and
Trademark Office

# Maintenance Fee Statement

10/26/2007 02:48 PM EDT

**Patent Number:** 5166809

**Customer Number:** 26389

CHRISTENSEN, O'CONNOR, JOHNSON, KINDNESS
1420 FIFTH AVENUE
SUITE 2800
SEATTLE WA 98101-2347

According to the records of the U.S. Patent and Trademark Office (USPTO), the maintenance fee and any necessary surcharge have been timely paid for the patent listed below. The "PYMT DATE" column indicates the payment date (i.e., the date the payment was filed).

The payment shown below is subject to actual collection. If the payment is refused or charged back by a financial institution, the payment will be void and the maintenance fee and any necessary surcharge unpaid.

Direct any questions about this statement to: Mail Stop M Correspondence, Director of the USPTO, P.O. Box 1450, Alexandria, VA 22313-1450.

| PATENT NUMBER | FEE AMT | SUR-CHARGE | PYMT DATE | U.S. APPLICATION NUMBER | PATENT ISSUE DATE | APPL. FILING DATE | PAYMENT YEAR | SMALL ENTITY? | ATTY DKT NUMBER |
|---|---|---|---|---|---|---|---|---|---|
| 5,166,809 | $1,610.00 | $0.00 | 05:18:04 | 07,521,080 | 11:24:92 | 05:08:90 | 12 | YES | SEEC15003 |

# EXHIBIT
# B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| SCREENTONE SYSTEMS CORPORATION, | § § § | |
| Plaintiff, | § § § | CIVIL ACTION NO. 2:07cv340-DF |
| v. | § § § | **JURY TRIAL DEMANDED** |
| CANON U.S.A., INC., EASTMAN KODAK COMPANY, PANASONIC CORPORATION OF NORTH AMERICA, RICOH AMERICAS CORPORATION, KONICA MINOLTA PRINTING SOLUTIONS U.S.A., INC., KYOCERA MITA AMERICA, INC., and HEIDELBERG USA, INC., | § § § § § § § § | |
| Defendants. | § § | |

## DECLARATION OF EDWARD R. NELSON, III
## IN SUPPORT OF PLAINTIFF'S SURREPLY
## IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS OR TRANSFER

I, Edward R. Nelson, III, declare as follows:

1.      My name is Edward R. Nelson, III.  I am a member of the Bar of this Court and a shareholder in the law firm of Friedman, Suder & Cooke, attorneys for Screentone Systems Corporation in *Screentone Systems Corp. v. Canon U.S.A., Inc. et al*, Civil Action No. 2:07cv340-DF, pending in the United States District Court for the Eastern District of Texas.

2.      I make this declaration in support of Plaintiff's Surreply In Opposition to Defendants' Motions to Dismiss or Transfer.  I am competent to testify to the matters stated in this declaration, have personal knowledge of the facts and statements herein, and each of the facts and statements is true and correct.

3.     Attached as Exhibit 1 are true and correct copies of WASH. REV. CODE §§ 23B.08.720 (2002), 23B.08.710 (2002), 62A.9A-619 (2002), 62A.9A-620 (2002), and 62A.9A-620 (2007) (with official comments).

I declare under penalty of perjury that the foregoing is true and correct. Executed this 30th day of October, 2007 at Fort Worth, Texas.

EDWARD R. NELSON, III

**EXHIBIT 1**

2 of 2 DOCUMENTS

ANNOTATED REVISED CODE OF WASHINGTON
Copyright © 2002 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** ARCHIVE DATA ***

*** (STATUTES CURRENT THROUGH 2002 REGULAR SESSION) ***
*** (ANNOTATIONS CURRENT THROUGH 2002 CUMULATIVE SUPPLEMENT) ***

TITLE 23B.  WASHINGTON BUSINESS CORPORATION ACT
CHAPTER 23B.08.  DIRECTORS AND OFFICERS

*Rev. Code Wash. (ARCW) § 23B.08.720* (2002)

§ 23B.08.720. Directors' action

(1) Directors' action respecting a transaction is effective for purposes of RCW 23B.08.710(2)(a) if the transaction received the affirmative vote of a majority, but no fewer than two, of those qualified directors on the board of directors or on a duly empowered committee of the board who voted on the transaction after either required disclosure to them, to the extent the information was not known by them, or compliance with subsection (2) of this section, provided that action by a committee is so effective only if:

(a) All its members are qualified directors; and

(b) Its members are either all the qualified directors on the board or are appointed by the affirmative vote of a majority of the qualified directors on the board.

(2) If a director has a conflicting interest respecting a transaction, but neither the director nor a related person of the director specified in RCW 23B.08.700(3)(a) is a party to the transaction, and if the director has a duty under law or professional canon, or a duty of confidentiality to another person, respecting information relating to the transaction such that the director may not make the disclosure described in RCW 23B.08.700(4)(b), then disclosure is sufficient for purposes of subsection (1) of this section if the director (a) discloses to the directors voting on the transaction the existence and nature of the director's conflicting interest and informs them of the character and limitations imposed by that duty before their vote on the transaction, and (b) plays no part, directly or indirectly, in their deliberations or vote.

(3) A majority, but no fewer than two, of all the qualified directors on the board of directors, or on the committee, constitutes a quorum for purposes of action that complies with this section. Directors' action that otherwise complies with this section is not affected by the presence or vote of a director who is not a qualified director.

Rev. Code Wash. (ARCW) § 23B.08.720

(4) For purposes of this section "qualified director" means, with respect to a director's conflicting interest transaction, any director who does not have either (a) a conflicting interest respecting the transaction, or (b) a familial, financial, professional, or employment relationship with a second director who does have a conflicting interest respecting the transaction, which relationship would, in the circumstances, reasonably be expected to exert an influence on the first director's judgment when voting on the transaction.

**HISTORY:** 1989 c 165 § 118.

USER NOTE: For more generally applicable notes, see notes under the first section of this heading, part, article, chapter or title.

1 of 2 DOCUMENTS

ANNOTATED REVISED CODE OF WASHINGTON
Copyright © 2002 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

\*\*\* ARCHIVE DATA \*\*\*

\*\*\* (STATUTES CURRENT THROUGH 2002 REGULAR SESSION) \*\*\*
\*\*\* (ANNOTATIONS CURRENT THROUGH 2002 CUMULATIVE SUPPLEMENT) \*\*\*

TITLE 23B.  WASHINGTON BUSINESS CORPORATION ACT
CHAPTER 23B.08.  DIRECTORS AND OFFICERS

*Rev. Code Wash. (ARCW) § 23B.08.710  (2002)*

§ 23B.08.710. Judicial action

   (1) A transaction effected or proposed to be effected by a corporation, or by a subsidiary of the corporation or any other entity in which the corporation has a controlling interest, that is not a director's conflicting interest transaction may not be enjoined, set aside, or give rise to an award of damages or other sanctions, in a proceeding by a shareholder or by or in the right of the corporation, because a director of the corporation, or any person with whom or which the director has a personal, economic, or other association, has an interest in the transaction.

   (2) A director's conflicting interest transaction may not be enjoined, set aside, or give rise to an award of damages or other sanctions, in a proceeding by a shareholder or by or in the right of the corporation, because the director, or any person with whom or which the director has a personal, economic, or other association, has an interest in the transaction, if:

      (a) Directors' action respecting the transaction was at any time taken in compliance with RCW **23B.08.720;**

      (b) Shareholders' action respecting the transaction was at any time taken in compliance with RCW 23B.08.730; or

      (c) The transaction, judged according to the circumstances at the time of commitment, is established to have been fair to the corporation.

**HISTORY:** 1989 c 165 § 117.

USER NOTE: For more generally applicable notes, see notes under the first section of this heading, part, article, chapter or title.

1 of 2 DOCUMENTS

ANNOTATED REVISED CODE OF WASHINGTON
Copyright © 2002 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** ARCHIVE DATA ***

*** (STATUTES CURRENT THROUGH 2002 REGULAR SESSION) ***
*** (ANNOTATIONS CURRENT THROUGH 2002 CUMULATIVE SUPPLEMENT) ***

TITLE 62A.  UNIFORM COMMERCIAL CODE
ARTICLE 9A.  SECURED TRANSACTIONS; SALES OF ACCOUNTS, CONTRACT RIGHTS
AND CHATTEL PAPER
PART 6.  DEFAULT

*Rev. Code Wash. (ARCW) § 62A.9A-619* (2002)

§ 62A.9A-619. Transfer of record or legal title


  (a) "Transfer statement." In this section, "transfer statement" means a record authenticated by a secured party stating:

     (1) That the debtor has defaulted in connection with an obligation secured by specified collateral;

     (2) That the secured party has exercised its post-default remedies with respect to the collateral;

     (3) That, by reason of the exercise, a transferee has acquired the rights of the debtor in the collateral; and

     (4) The name and mailing address of the secured party, debtor, and transferee.

  (b) Effect of transfer statement. A transfer statement entitles the transferee to the transfer of record of all rights of the debtor in the collateral specified in the statement in any official filing, recording, registration, or certificate-of-title system covering the collateral. If a transfer statement is presented with the applicable fee and request form to the official or office responsible for maintaining the system, the official or office shall:

     (1) Accept the transfer statement;

     (2) Promptly amend its records to reflect the transfer; and

     (3) If applicable, issue a new appropriate certificate of title in the name of the transferee.

  (c) Transfer not a disposition; no relief of secured party's duties. A transfer of the record or legal title to collateral to a secured party under subsection (b) of this section or otherwise is not of itself a

Rev. Code Wash. (ARCW) § 62A.9A-619

disposition of collateral under this Article and does not of itself relieve the secured party of its duties under this Article.

**HISTORY:** 2000 c 250 § 9A-619.

USER NOTE: For more generally applicable notes, see notes under the first section of this heading, part, article, chapter or title.

3 of 4 DOCUMENTS

ANNOTATED REVISED CODE OF WASHINGTON
Copyright © 2002 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** ARCHIVE DATA ***

*** (STATUTES CURRENT THROUGH 2002 REGULAR SESSION) ***
*** (ANNOTATIONS CURRENT THROUGH 2002 CUMULATIVE SUPPLEMENT) ***

TITLE 62A.  UNIFORM COMMERCIAL CODE
ARTICLE 9A.  SECURED TRANSACTIONS; SALES OF ACCOUNTS, CONTRACT RIGHTS
AND CHATTEL PAPER
PART 6.  DEFAULT

*Rev. Code Wash. (ARCW) § 62A.9A-620*  (2002)

§ **62A.9A-620.** Acceptance of collateral in full or partial satisfaction of obligation; compulsory disposition of collateral

(a) Conditions to acceptance in satisfaction. A secured party may accept collateral in full or partial satisfaction of the obligation it secures only if:

(1) The debtor consents to the acceptance under subsection (c) of this section;

(2) The secured party does not receive, within the time set forth in subsection (d) of this section, a notification of objection to the proposal authenticated by:

(A) A person to which the secured party was required to send a proposal under RCW 62A.9A-621; or

(B) Any other person, other than the debtor, holding an interest in the collateral subordinate to the security interest that is the subject of the proposal; and

(3) Subsection (e) of this section does not require the secured party to dispose of the collateral or the debtor waives the requirement pursuant to RCW 62A.9A-624.

(b) Purported acceptance ineffective. A purported or apparent acceptance of collateral under this section is ineffective unless:

(1) The secured party consents to the acceptance in an authenticated record or sends a proposal to the debtor; and

(2) The conditions of subsection (a) of this section are met.

(c) Debtor's consent. For purposes of this section:

Rev. Code Wash. (ARCW) § 62A.9A-620

(1) A debtor consents to an acceptance of collateral in partial satisfaction of the obligation it secures only if the debtor agrees to the terms of the acceptance in a record authenticated after default; and

(2) A debtor consents to an acceptance of collateral in full satisfaction of the obligation it secures only if the debtor agrees to the terms of the acceptance in a record authenticated after default or the secured party:

(A) Sends to the debtor after default a proposal that is unconditional or subject only to a condition that collateral not in the possession of the secured party be preserved or maintained;

(B) In the proposal, proposes to accept collateral in full satisfaction of the obligation it secures; and

(C) Does not receive a notification of objection authenticated by the debtor within twenty days after the proposal is sent.

(d) Effectiveness of notification. To be effective under subsection (a)(2) of this section, a notification of objection must be received by the secured party:

(1) In the case of a person to which the proposal was sent pursuant to RCW 62A.9A-621, within twenty days after notification was sent to that person; and

(2) In other cases:

(A) Within twenty days after the last notification was sent pursuant to RCW 62A.9A-621; or

(B) If a notification was not sent, before the debtor consents to the acceptance under subsection (c) of this section.

(e) Mandatory disposition of consumer goods. A secured party that has taken possession of collateral shall dispose of the collateral pursuant to RCW 62A.9A-610 within the time specified in subsection (f) of this section if:

(1) Sixty percent of the cash price has been paid in the case of a purchase-money security interest in consumer goods; or

(2) Sixty percent of the principal amount of the obligation secured has been paid in the case of a nonpurchase-money security interest in consumer goods.

(f) Compliance with mandatory disposition requirement. To comply with subsection (e) of this section, the secured party shall dispose of the collateral:

(1) Within ninety days after taking possession; or

(2) Within any longer period to which the debtor and all secondary obligors have agreed in an agreement to that effect entered into and authenticated after default.

**HISTORY:** 2000 c 250 § 9A-620.

JUDICIAL DECISIONS

ANALYSIS
Election of remedies

Rev. Code Wash. (ARCW) § 62A.9A-620

Loss of use
Retention of collateral
Secured creditor

ELECTION OF REMEDIES.
   The rule which implies an election of remedies when a creditor retains repossessed collateral for an unreasonable period of time applied to a farm equipment purchase/lease agreement. *Swanson v. May, 40 Wn. App. 148, 697 P.2d 1013 (1985).*

LOSS OF USE.
   This section gives debtor no right of action for loss of use of repossessed property. *Borg-Warner Acceptance Corp. v. Scott, 86 Wn.2d 276, 543 P.2d 638 (1975).*

RETENTION OF COLLATERAL.
   The rule which implies an election of remedies when a creditor retains repossessed collateral for an unreasonable period of time applied to a farm equipment purchase/lease agreement. *Swanson v. May, 40 Wn. App. 148, 697 P.2d 1013 (1985).*
   Supplemental evidence supported trial court's finding that fourteen months was not an unreasonable period of time for creditor to sell repossessed farm equipment, thus is could not be implied that the creditor had elected to retain the collateral in full satisfaction of the debt in lieu of selling the collateral and applying the proceeds to the debt. *Swanson v. May, 40 Wn. App. 148, 697 P.2d 1013 (1985).*
   Substantial evidence supported trial court's finding that 14 months was not an unreasonable period of time for credit to sell repossessed farm equipment, thus is could not be implied that the creditor had elected to retain the collateral in full satisfaction of the debt in lieu of selling the collateral and applying the proceeds to the debt. *Swanson v. May, 40 Wn. App. 148, 697 P.2d 1013 (1985).*
   A secured party who retains a chattel for an excessive period of time without disposing of it should not be permitted to profit by his failure to furnish the requisite notice of intention to retain. *Service Chevrolet, Inc. v. Sparks, 99 Wn.2d 199, 660 P.2d 760 (1983).*
   There is a reasonable limit to the length of time a secured party is permitted to hold collateral before the party is deemed to have exercised its right to retain the collateral in satisfaction of the obligation, and what is a reasonable period is a question of fact for the trier of fact. *Service Chevrolet, Inc. v. Sparks, 99 Wn.2d 199, 660 P.2d 760 (1983).*

SECURED CREDITOR.
   Creditor corporation had the status of a secured creditor in the accounts receivable of debtor corporation prior to the time when it took over the debtor corporation; thus takeover did not constitute a voidable preference in the amount of the value of the debtor corporation's accounts receivable. *Uni-Com N.W., Ltd. v. Argus Publishing Co., 47 Wn. App. 787, 737 P.2d 304,* review denied, *108 Wn.2d 1032 (1987).*

USER NOTE: For more generally applicable notes, see notes under the first section of this heading, part, article, chapter or title.

1 of 1 DOCUMENT

ANNOTATED REVISED CODE OF WASHINGTON
Copyright © 2007 by Matthew Bender & Company, Inc.,
a member of the LexisNexis Group.
All rights reserved.

*** Statutes current through all newly enacted legislation ***
*** that is effective through July 21, 2007 ***
*** Annotations current through July 12, 2007 ***

TITLE 62A.  UNIFORM COMMERCIAL CODE
ARTICLE 9A.  SECURED TRANSACTIONS; SALES OF ACCOUNTS, CONTRACT RIGHTS
AND CHATTEL PAPER
PART 6.  DEFAULT

**GO TO REVISED CODE OF WASHINGTON ARCHIVE DIRECTORY**

*Rev. Code Wash. (ARCW) § 62A.9A-620  (2007)*

§ 62A.9A-620. Acceptance of collateral in full or partial satisfaction of obligation; compulsory disposition of collateral

(a) Conditions to acceptance in satisfaction. A secured party may accept collateral in full or partial satisfaction of the obligation it secures only if:

(1) The debtor consents to the acceptance under subsection (c) of this section;

(2) The secured party does not receive, within the time set forth in subsection (d) of this section, a notification of objection to the proposal authenticated by:

(A) A person to which the secured party was required to send a proposal under *RCW 62A.9A-621*; or

(B) Any other person, other than the debtor, holding an interest in the collateral subordinate to the security interest that is the subject of the proposal; and

(3) Subsection (e) of this section does not require the secured party to dispose of the collateral or the debtor waives the requirement pursuant to *RCW 62A.9A-624.*

(b) Purported acceptance ineffective. A purported or apparent acceptance of collateral under this section is ineffective unless:

(1) The secured party consents to the acceptance in an authenticated record or sends a proposal to the debtor; and

(2) The conditions of subsection (a) of this section are met.

Rev. Code Wash. (ARCW) § 62A.9A-620

(c) Debtor's consent. For purposes of this section:

(1) A debtor consents to an acceptance of collateral in partial satisfaction of the obligation it secures only if the debtor agrees to the terms of the acceptance in a record authenticated after default; and

(2) A debtor consents to an acceptance of collateral in full satisfaction of the obligation it secures only if the debtor agrees to the terms of the acceptance in a record authenticated after default or the secured party:

(A) Sends to the debtor after default a proposal that is unconditional or subject only to a condition that collateral not in the possession of the secured party be preserved or maintained;

(B) In the proposal, proposes to accept collateral in full satisfaction of the obligation it secures; and

(C) Does not receive a notification of objection authenticated by the debtor within twenty days after the proposal is sent.

(d) Effectiveness of notification. To be effective under subsection (a)(2) of this section, a notification of objection must be received by the secured party:

(1) In the case of a person to which the proposal was sent pursuant to *RCW 62A.9A-621*, within twenty days after notification was sent to that person; and

(2) In other cases:

(A) Within twenty days after the last notification was sent pursuant to *RCW 62A.9A-621*; or

(B) If a notification was not sent, before the debtor consents to the acceptance under subsection (c) of this section.

(e) Mandatory disposition of consumer goods. A secured party that has taken possession of collateral shall dispose of the collateral pursuant to *RCW 62A.9A-610* within the time specified in subsection (f) of this section if:

(1) Sixty percent of the cash price has been paid in the case of a purchase-money security interest in consumer goods; or

(2) Sixty percent of the principal amount of the obligation secured has been paid in the case of a nonpurchase-money security interest in consumer goods.

(f) Compliance with mandatory disposition requirement. To comply with subsection (e) of this section, the secured party shall dispose of the collateral:

(1) Within ninety days after taking possession; or

(2) Within any longer period to which the debtor and all secondary obligors have agreed in an agreement to that effect entered into and authenticated after default.

**HISTORY:** 2000 c 250 § 9A-620.

**NOTES:**
OFFICIAL COMMENT
  1. *Source.* Former section 9-505.

Rev. Code Wash. (ARCW) § 62A.9A-620

2. *Overview.* This section and the two sections following deal with strict foreclosure, a procedure by which the secured party acquires the debtor's interest in the collateral without the need for a sale or other disposition under section 9-610. Although these provisions derive from former section 9-505, they have been entirely reorganized and substantially rewritten. The more straightforward approach taken in this Article eliminates the fiction that the secured party always will present a "proposal" for the retention of collateral and the debtor will have a fixed period to respond. By eliminating the need (but preserving the possibility) for proceeding in that fashion, this section eliminates much of the awkwardness of former section 9-505. It reflects the belief that strict foreclosures should be encouraged and often will produce better results than a disposition for all concerned.

Subsection (a) sets forth the conditions necessary to an effective acceptance (formerly, retention) of collateral in full or partial satisfaction of the secured obligation. Section 9-621 requires in addition that a secured party who wishes to proceed under this section notify certain other persons who have or claim to have an interest in the collateral. Unlike the failure to meet the conditions in subsection (a), under section 9-622(b) the failure to comply with the notification requirement of section 9-621 does not render the acceptance of collateral ineffective. Rather, the acceptance can take effect notwithstanding the secured party's noncompliance. A person to whom the required notice was not sent has the right to recover damages under section 9-625(b). Section 9-622(a) sets forth the effect of an acceptance of collateral.

3. *Conditions to Effective Acceptance.* Subsection (a) contains the conditions necessary to the effectiveness of an acceptance of collateral. Subsection (a)(1) requires the debtor's consent. Under subsections (c)(1) and (c)(2), the debtor may consent by agreeing to the acceptance in writing after default. Subsection (c)(2) contains an alternative method by which to satisfy the debtor's-consent condition in subsection (a)(1). It follows the proposal-and-objection model found in former section 9-505: The debtor consents if the secured party sends a proposal to the debtor and does not receive an objection within 20 days. Under subsection (c)(1), however, that silence is not deemed to be consent with respect to acceptances in partial satisfaction. Thus, a secured party who wishes to conduct a "partial strict foreclosure" must obtain the debtor's agreement in a record authenticated after default. In all other respects, the conditions necessary to an effective partial strict foreclosure are the same as those governing acceptance of collateral in full satisfaction. (But see subsection (g), prohibiting partial strict foreclosure of a security interest in consumer transactions.)

The time when a debtor consents to a strict foreclosure is significant in several circumstances under this section and the following one. See sections 9-620(a)(1), (d)(2), 9-621(a)(1), (a)(2), and (a)(3). For purposes of determining the time of consent, a debtor's conditional consent constitutes consent.

Subsection (a)(2) contains the second condition to the effectiveness of an acceptance under this section--the absence of a timely objection from a person holding a junior interest in the collateral or from a secondary obligor. Any junior party--secured party or lienholder--is entitled to lodge an objection to a proposal, even if that person was not entitled to notification under section 9-621. Subsection (d), discussed below, indicates when an objection is timely.

Subsections (a)(3) and (a)(4) contain special rules for transactions in which consumers are involved. See comment 12.

4. *Proposals.* Section 9-102 defines the term "proposal." It is necessary to send a "proposal" to the debtor only if the debtor does not agree to an acceptance in an authenticated record as described in subsection (c)(1) or (c)(2). Section 9-621(a) determines whether it is necessary to send a proposal to third parties. A proposal need not take any particular form as long as it sets forth the terms under which the secured party is willing to accept collateral in satisfaction. A proposal to accept collateral

Rev. Code Wash. (ARCW) § 62A.9A-620

should specify the amount (or a means of calculating the amount, such as by including a per diem accrual figure) of the secured obligations to be satisfied, state the conditions (if any) under which the proposal may be revoked, and describe any other applicable conditions. Note, however, that a conditional proposal generally requires the debtor's agreement in order to take effect. See subsection (c).

5. *Secured Party's Agreement; No "Constructive" Strict Foreclosure.* The conditions of subsection (a) relate to actual or implied consent by the debtor and any secondary obligor or holder of a junior security interest or lien. To ensure that the debtor cannot unilaterally cause an acceptance of collateral, subsection (b) provides that compliance with these conditions is necessary but not sufficient to cause an acceptance of collateral. Rather, under subsection (b), acceptance does not occur unless, in addition, the secured party consents to the acceptance in an authenticated record or sends to the debtor a proposal. For this reason, a mere delay in collection or disposition of collateral does not constitute a "constructive" strict foreclosure. Instead, delay is a factor relating to whether the secured party acted in a commercially reasonable manner for purposes of section 9-607 or 9-610. A debtor's voluntary surrender of collateral to a secured party and the secured party's acceptance of possession of the collateral does not, of itself, necessarily raise an implication that the secured party intends or is proposing to accept the collateral in satisfaction of the secured obligation under this section.

6. *When Acceptance Occurs.* This section does not impose any formalities or identify any steps that a secured party must take in order to accept collateral once the conditions of subsections (a) and (b) have been met. Absent facts or circumstances indicating a contrary intention, the fact that the conditions have been met provides a sufficient indication that the secured party has accepted the collateral on the terms to which the secured party has consented or proposed and the debtor has consented or failed to object. Following a proposal, acceptance of the collateral normally is automatic upon the secured party's becoming bound and the time for objection passing. As a matter of good business practice, an enforcing secured party may wish to memorialize its acceptance following a proposal, such as by notifying the debtor that the strict foreclosure is effective or by placing a written record to that effect in its files. The secured party's agreement to accept collateral is self-executing and cannot be breached. The secured party is bound by its agreement to accept collateral and by any proposal to which the debtor consents.

7. *No Possession Requirement.* This section eliminates the requirement in former section 9-505 that the secured party be "in possession" of collateral. It clarifies that intangible collateral, which cannot be possessed, may be subject to a strict foreclosure under this section. However, under subsection (a)(3), if the collateral is consumer goods, acceptance does not occur unless the debtor is not in possession.

8. *When Objection Timely.* Subsection (d) explains when an objection is timely and thus prevents an acceptance of collateral from taking effect. An objection by a person to which notification was sent under section 9-621 is effective if it is received by the secured party within 20 days from the date the notification was sent to that person. Other objecting parties (i.e., third parties who are not entitled to notification) may object at any time within 20 days after the last notification is sent under section 9-621. If no such notification is sent, third parties must object before the debtor agrees to the acceptance in writing or is deemed to have consented by silence. The former may occur any time after default, and the latter requires a 20-day waiting period. See subsection (c).

9. *Applicability of Other Law.* This section does not purport to regulate all aspects of the transaction by which a secured party may become the owner of collateral previously owned by the debtor. For example, a secured party's acceptance of a motor vehicle in satisfaction of secured obligations

Rev. Code Wash. (ARCW) § 62A.9A-620

may require compliance with the applicable motor vehicle certificate of title law. State legislatures should conform those laws so that they mesh well with this section and section 9-610, and courts should construe those laws and this section harmoniously. A secured party's acceptance of collateral in the possession of the debtor also may implicate statutes dealing with a seller's retention of possession of goods sold.

10. *Accounts, Chattel Paper, Payment Intangibles, and Promissory Notes.* If the collateral is accounts, chattel paper, payment intangibles, or promissory notes, then a secured party's acceptance of the collateral in satisfaction of secured obligations would constitute a sale to the secured party. That sale normally would give rise to a new security interest (the ownership interest) under sections 1-201(37) and 9-109. In the case of accounts and chattel paper, the new security interest would remain perfected by a filing that was effective to perfect the secured party's original security interest. In the case of payment intangibles or promissory notes, the security interest would be perfected when it attaches. See section 9-309. However, the procedures for acceptance of collateral under this section satisfy all necessary formalities and a new security agreement authenticated by the debtor would not be necessary.

11. *Role of Good Faith.* Section 1-203 imposes an obligation of good faith on a secured party's enforcement under this Article. This obligation may not be disclaimed by agreement. See section 1-102. Thus, a proposal and acceptance made under this section in bad faith would not be effective. For example, a secured party's proposal to accept marketable securities worth $1,000 in full satisfaction of indebtedness in the amount of $100, made in the hopes that the debtor might inadvertently fail to object, would be made in bad faith. On the other hand, in the normal case proposals and acceptances should be not second guessed on the basis of the "value" of the collateral involved. Disputes about valuation or even a clear excess of collateral value over the amount of obligations satisfied do not necessarily demonstrate the absence of good faith.

12. *Special Rules in Consumer Cases.* Subsection (e) imposes an obligation on the secured party to dispose of consumer goods under certain circumstances. Subsection (f) explains when a disposition that is required under subsection (e) is timely. An effective acceptance of collateral cannot occur if subsection (e) requires a disposition unless the debtor waives this requirement pursuant to section 9-624(b). Moreover, a secured party who takes possession of collateral and unreasonably delays disposition violates subsection (e), if applicable, and may also violate section 9-610 or other provisions of this part. Subsection (e) eliminates as superfluous the express statutory reference to "conversion" found in former section 9-505. Remedies available under other law, including conversion, remain available under this Article in appropriate cases. See sections 1-103 and 1-106.

Subsection (g) prohibits the secured party in consumer transactions from accepting collateral in partial satisfaction of the obligation it secures. If a secured party attempts an acceptance in partial satisfaction in a consumer transaction, the attempted acceptance is void.

JUDICIAL DECISIONS

ANALYSIS
Election of remedies
Loss of use
Retention of collateral
Secured creditor

ELECTION OF REMEDIES.

The rule which implies an election of remedies when a creditor retains repossessed collateral for an unreasonable period of time applied to a farm equipment purchase/lease agreement. *Swanson v. May, 40 Wn. App. 148, 697 P.2d 1013 (1985).*

LOSS OF USE.
This section gives debtor no right of action for loss of use of repossessed property. *Borg-Warner Acceptance Corp. v. Scott, 86 Wn.2d 276, 543 P.2d 638 (1975).*

RETENTION OF COLLATERAL.
The rule which implies an election of remedies when a creditor retains repossessed collateral for an unreasonable period of time applied to a farm equipment purchase/lease agreement. *Swanson v. May, 40 Wn. App. 148, 697 P.2d 1013 (1985).*

Supplemental evidence supported trial court's finding that fourteen months was not an unreasonable period of time for creditor to sell repossessed farm equipment, thus is could not be implied that the creditor had elected to retain the collateral in full satisfaction of the debt in lieu of selling the collateral and applying the proceeds to the debt. *Swanson v. May, 40 Wn. App. 148, 697 P.2d 1013 (1985).*

Substantial evidence supported trial court's finding that 14 months was not an unreasonable period of time for credit to sell repossessed farm equipment, thus is could not be implied that the creditor had elected to retain the collateral in full satisfaction of the debt in lieu of selling the collateral and applying the proceeds to the debt. *Swanson v. May, 40 Wn. App. 148, 697 P.2d 1013 (1985).*

A secured party who retains a chattel for an excessive period of time without disposing of it should not be permitted to profit by his failure to furnish the requisite notice of intention to retain. *Service Chevrolet, Inc. v. Sparks, 99 Wn.2d 199, 660 P.2d 760 (1983).*

There is a reasonable limit to the length of time a secured party is permitted to hold collateral before the party is deemed to have exercised its right to retain the collateral in satisfaction of the obligation, and what is a reasonable period is a question of fact for the trier of fact. *Service Chevrolet, Inc. v. Sparks, 99 Wn.2d 199, 660 P.2d 760 (1983).*

SECURED CREDITOR.
Creditor corporation had the status of a secured creditor in the accounts receivable of debtor corporation prior to the time when it took over the debtor corporation; thus takeover did not constitute a voidable preference in the amount of the value of the debtor corporation's accounts receivable. *Uni-Com N.W., Ltd. v. Argus Publishing Co., 47 Wn. App. 787, 737 P.2d 304, review denied, 108 Wn.2d 1032 (1987).*

USER NOTE: For more generally applicable notes, see notes under the first section of this heading, part, article, chapter or title.

# EXHIBIT
# C

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

SCREENTONE SYSTEMS
CORPORATION,

      Plaintiff,

v.

CANON U.S.A., INC., EASTMAN KODAK
COMPANY, PANASONIC CORPORATION
OF NORTH AMERICA, RICOH
AMERICAS CORPORATION, KONICA
MINOLTA PRINTING SOLUTIONS U.S.A.,
INC., KYOCERA MITA AMERICA, INC.,
and HEIDELBERG USA, INC.,

      Defendants.

CIVIL ACTION NO. 2:07cv340-DF

**JURY TRIAL DEMANDED**

## DECLARATION OF CLAYTON J. HAYNES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS OR TRANSFER

1.    My name is Clayton J. Haynes. I am the Chief Financial Officer of Acacia Patent Acquisition Corporation ("APAC") and its subsidiary, Screentone Systems Corporation ("Screentone"). I am over the age of twenty-one and am in all respects competent to make this declaration. I have personal knowledge of the matters set forth below, and the factual matters set forth below are true and correct.

2.    APAC maintains an office in Frisco, Texas. The physical address is 6136 Frisco Square Blvd., 4th Floor, Frisco, Texas 75034. APAC maintains a continual presence in the Frisco office and conducts substantial patent portfolio management and patent licensing business from the Frisco office.

3.    I understand that Screentone filed an action against Canon U.S.A., Inc. and others alleging infringement of U.S. Patent No. 5,166,809 ("'809 patent") in the Eastern District of

1

Texas. Screentone considered possible forums and chose to file in the Marshall Division of the Eastern District of Texas in large part due to the fact that: (i) Screentone could accelerate the typical time to trial by doing so; and (ii) Screentone is aware that the Marshall Division has a great deal of experience in conducting patent cases.

4.    I understand that it may be necessary for APAC to join the action pending in the Eastern District of Texas due to a mistake in the assignment of rights in and to the '809 patent from APAC to Screentone. I understand that APAC mistakenly retained the right to collect past damages for infringements of the '809 patent up to the date Screentone became the '809 patent owner. If the Court deems it necessary, APAC will join the present lawsuit voluntarily as a plaintiff.

5.    Moreover, if needed, APAC representatives, including me, are willing to travel to the Eastern District of Texas to testify at trial.

6.    Traveling to the Eastern District of Texas to testify will pose no inconvenience, and APAC representatives agree to do so.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge. Executed this 15th day of October, 2007 at Newport Beach, California.

CLAYTON J. HAYNES